# GLENN LUTHER, d.b.a. BROOKLYN CENTER MACHINE & TOOL COMPANY, v. STANDARD CONVEYOR COMPANY.

89 N. W. (2d) 179.

April 3, 1958—No. 37,258.

*Oppenheimer, Hodgson, Brown, Baer & Wolff, David C. Donnelly,* and *Sherman Winthrop,* for appellant.

*Ernest W. Erickson,* for respondent.

DELL, CHIEF JUSTICE.

Defendant appeals from an order denying its motion for judgment notwithstanding the verdict or in the alternative for a new trial.

The action arises out of an alleged breach of contract between the plaintiff, a designer and manufacturer of production machines, and defendant, a manufacturer of conveyor systems, for the sale of a reciprocating bearing assembly machine. Late in 1952 plaintiff learned that defendant was in the market for a new machine to assemble ball bearings and he solicited the appropriate officers of defendant to secure the business. At that time defendant was using what was known in the trade as a rotary turntable to assemble the bearings. Component parts of the bearings were put together by hand on an assembly-line basis. After each employee had performed her operation the table was advanced forward one notch. When the bearing was completely assembled and while still on the rotary table it would move under a punch press for final clinching. A two-step operation was performed by the press. The edges of the outside shell were first partially crimped and then the press hit the bearing a second time and completely sealed it. The principal objections to the rotary table were its limited output (approximately 20 to 23 bearings a minute) and its tendency to move, start, and stop with a jerk, often causing the balls to spill out of the partially assembled bearings.

After numerous discussions between the parties, it was agreed that defendant's needs could best be served by a machine with a constantly moving transfer device, the acceleration of which could be hydraulically controlled. The contract was embodied in defendant's written purchase order of March 4, 1953, and plaintiff's letter of acceptance of March 7. The purchase order called for a machine 9 feet long which could be attached to defendant's existing punch press and which would be suitable for assembling 45 bearings a minute without spilling balls or other parts. Plans were to be submitted within 30 days and the machine was to be completed within 90 days after the plans were approved. The machine was to operate continually instead of stopping for each operation and the only stoppage was to be by pushbutton or by action of a detector which indicated that extra parts were in the bearing. The purchase price was $6,500, of which 10 percent or $650 was

enclosed with the order; another 10 percent was to be paid upon approval of the blueprints; and the balance was "to become due 30 days after the machine is operating to our [defendant's] satisfaction." Plaintiff was to supervise the installation but the work itself was to be done by defendant's employees.

Some modifications were provided by plaintiff's letter of acceptance. The time for submitting plans and for final delivery was extended to 60 and 120 days respectively. The stoppage function of the machine was amplified to include improperly completed bearings, those which were not properly located on the table, and those with an incorrect ball count. A suggestion was made to decrease the length of the machine to 8 feet but this was rejected. It is not clear how many employees were to be located around the machine. There is no doubt that at least six were contemplated. The purchase order speaks of a "suitable length to accommodate three operators on each side." Whether a seventh person was to be seated at the end is questionable. Defendant's order does not mention it, but plaintiff's letter of acceptance refers to "three operators on each side with one on the end." The final paragraph of plaintiff's letter is as follows:

"The above machine is to remain my property until paid in full. If it cannot be made to operate to your satisfaction, I will take it out and refund any money you have paid me on it. This to be the full extent of my liability."

Plaintiff made several trips to defendant's plant and thoroughly inspected it before he drew up and submitted the blueprints of the machine to the defendant. The plans were approved by defendant, another $650 was paid to the plaintiff, and he began to construct the machine. By the fall of 1953 the machine had been built and plaintiff requested some of defendant's officers to visit his shop in order to watch a trial run. This turned out to be unsuccessful and certain adjustments had to be made. When these were completed, the machine was picked up by defendant and delivered to its plant on October 24, 1953. A 3-week delay in the installation was occasioned by a strike. Thereafter defendant proceeded to install the machine without plaintiff's supervision. Due to an oversight, the wrong schematic diagram of the

machine's electrical wiring was sent to defendant's plant and one of the men there attempted to rewire it to that diagram. Further changes were required to accommodate the machine to the punch press because of the former's height. After these had been made the new machine was attached to the punch press but the two failed to work together. Plaintiff's machine was removed and he was notified. Subsequently a correct schematic diagram was produced and plaintiff rewired the machine as it was originally designed. It was again attached to the punch press—this time under plaintiff's supervision—and another "dry run" was conducted on a Saturday in December 1953. This was successful and the machine was scheduled to go into production the following Monday morning.

On Monday morning the machine again failed to work and plaintiff was summoned. This time he diagnosed the trouble as insufficient air pressure. Although the written contract was silent in that regard, plaintiff claimed that defendant had promised to provide the machine with 100 pounds of pressure per square inch but that was denied, the boiler inspector having forbidden defendant to use more than 85 pounds of pressure per inch for safety reasons. Although the machine ran successfully during the trial the preceding Saturday while the plant's other machinery was idle, on Monday the other machinery in the plant also put a drain upon the supply of air so that at times the pressure on this machine dropped as low as 45 pounds per inch. A larger air cylinder was needed which would operate on fewer pounds of pressure and plaintiff agreed to design and build one, which he did. The new cylinder was attached to the machine in January 1954 and the machine was again connected to the punch press. This time it did not work satisfactorily either and plaintiff then complained that it was because defective parts were being used in the bearings. It appears that occasionally one of the parts which fit just inside the outside shell of the bearing was not perfectly round and could not be dropped into place. This required that the part be hammered into the outside shell and during this period a defective bearing or no bearing at all might pass by the detector which would cause the machine to stop. Problems concerning synchronization also arose. In any event plaintiff admitted that his machine did not work properly while attached to the old punch

press and it was disconnected in February awaiting a new punch press which was installed on June 11, 1954.

Plaintiff's records showed that he did not visit defendant's plant between February and August 1954 when he came to get a schematic diagram of the wiring of the new punch press. During September 1954 plaintiff made further adjustments and attached the machine to the new press. Again it did not work properly and again plaintiff claimed that this was due to bad parts which defendant was using. Plaintiff made several trips to defendant's plant from September through December 1954. Finally in February 1955 one of defendant's employees recommended that the machine be taken out, to which plaintiff apparently assented on the grounds that "This thing is costing me too much coin running back and forth from Minneapolis. I would just as soon have it over with." The machine was returned to plaintiff in March 1955.

Plaintiff then instituted this action to recover the remainder of the purchase price of the machine and the reasonable value of parts furnished and services rendered in connection with its installation. Defendant counterclaimed asking, among other things, the return of the $1,300 it had expended on the ground that the machine failed to operate satisfactorily and that according to the guarantee it could, therefore, be returned. The case was submitted to a jury which found for the plaintiff.

■ Since this case involves the sale of goods it is governed by our Sales Act. M. S. A. 512.15(1) provides:

"Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose."

"An implied warranty is not one of the contractual elements of an agreement. It is not one of the essential elements to be stated in the contract nor does its application or effective existence rest or depend upon the affirmative intention of the parties. It is a child of the law. Because of the acts of the parties, it is imposed by the law. It arises

independently and outside of the contract. The law annexes it to the contract. It writes it, by implication, into the contract which the parties have made."[1]

Our cases have accepted the principle that, where the buyer fully informs the seller of his particular needs and the seller undertakes to supply an article suitable for the purpose intended, there is an implied warranty that the article will be fit for that purpose.[2] This principle is now recognized in all of the states and it would serve no useful purpose to cite a long series of cases in support thereof.[3] The doctrine also extends to cases in which the buyer has had some experience with the general field, but where he relies upon the seller's judgment.[4]

In the present case plaintiff was commissioned to build a machine which could assemble the same parts then being used in defendant's operations and which would fit into the existing scheme of defendant's production. He was given full opportunity to inspect the defendant's plant and his recommendations were based upon that inspection. "It was not enough that the machine was of a certain size or description, or that, when new and clean, or under specially favorable circumstances, it temporarily fulfilled the conditions of the agreement, if there were such inherent defects in it as to prevent its successful operation, so that, ordinarily, under proper management, it could not turn out the stipulated amount * * *."[5]

■ The entire theory of defendant's case was that the machine which was delivered to its plant did not serve the purpose for which it was intended and that consequently there was a breach of the implied warranty of fitness. It was incumbent upon defendant to sustain the

---

[1]Bekkevold v. Potts, 173 Minn. 87, 89, 216 N. W. 790, 791, 59 A. L. R. 1164.

[2]E. Edelman & Co. v. Queen Stove Works, Inc. 205 Minn. 7, 284 N. W. 838; Iron Fireman Coal Stoker Co. v. Brown, 182 Minn. 399, 234 N. W. 685.

[3]But see, Annotations, 59 A. L. R. 1180, 90 A. L. R. 410, 164 A. L. R. 1321, 168 A. L. R. 389, and 52 A. L. R. (2d) 900.

[4]Juvland v. Wood Bros. Thresher Co. 212 Minn. 310, 3 N. W. (2d) 772; Hausken v. Hodson-Feenaughty Co. 109 Wash. 606, 187 P. 319.

[5]Cosgrove v. Bennett, 32 Minn. 371, 374, 20 N. W. 359, 361.

burden of proof as to the breach of warranty.[6]  But it was likewise incumbent upon the trial judge to charge the jury on the issue of breach of warranty even though defendant's requested instructions on that issue left much to be desired.  A party is entitled to an instruction based upon his theory of the case if there is evidence to support it; and if the requested instruction is not entirely proper, it is the duty of the court to correct it.[7]  This it failed to do and the defendant is, therefore, entitled to a new trial unless we are required to hold as a matter of law that defendant waited too long before returning the machine.

The law allows a buyer a reasonable time in which to reject an article on the grounds of breach of warranty,[8] and when the breach of warranty can only be determined after using the article, the buyer may use it for a reasonable time before rejection.[9]  In the instant case defendant was entitled to try out a machine which was in good working condition before reaching a decision.  Plaintiff admits that his machine did not work properly until the new punch press was attached.  Even then he was constantly summoned back to defendant's plant because the machine failed to operate.  Under the circumstances we conclude that whether or not defendant acted within a reasonable time presented a question which was properly for the trier of facts.

■ There is another ground which we feel requires a new trial.  The machine here was to be made to defendant's satisfaction.  In Magee v. Scott & Holston Lbr. Co. 78 Minn. 11, 15, 80 N. W. 781, 782, we said:

"* * * The law regards the parties as competent to contract that the right of decision as to the satisfactory character of services rendered or of an article furnished shall be absolutely reserved to the party for whom the services are to be rendered or the article is to be made or

---

[6]Potter Mfg. Corp. v. Bemidji Lutheran Hospital, 188 Minn. 32, 246 N. W. 470; Prizer-Painter Stove & Heater Co. v. Peaslee, 99 Minn. 275, 109 N. W. 232.

[7]Hagen v. Snow, 244 Minn. 101, 69 N. W. (2d) 100; Chicago & N. W. Ry. Co. v. Green (8 Cir.) 164 F. (2d) 55, 61.

[8]Wirth v. Fawkes, 109 Minn. 254, 123 N. W. 661.

[9]Laganas Shoe Mfg. Co. v. Sharwood, 173 Minn. 535, 217 N. W. 941; and see, Annotation, 52 A. L. R. (2d) 900, § 11.

furnished; and, if the facts are sufficient to show that they did so contract, their stipulation is the law of the case, at least unless there is something in the contract against public policy."

The trial court, however, submitted the case to the jury on the theory that defendant's satisfaction meant that the machine had to "operate so as to perform efficiently the exact functions required by the terms of the contract, in the precise manner contemplated by the parties as described in the contract, so that it would be satisfactory to a reasonable person in the defendants' position." As presently worded this instruction is inaccurate and misleading. When parties to a sales contract agree that the buyer's satisfaction is to be guaranteed, the standard to be applied is not that of a reasonable man in the buyer's position, which would be appropriate in an action involving negligence, but of the buyer himself acting in a reasonable manner. In this instance only defendant's reasonableness, good faith, and honesty in rejecting the machine, along with any changes which might have occurred between the time the machine was ordered and the time it was installed, were matters for consideration. In view of what has been said a new trial must be granted.

Reversed and new trial granted.