GEORGE SYNNOTT AND ANOTHER v.
MIDWAY HOSPITAL.

178 N. W. (2d) 211.

June 5, 1970—No. 42057.

---

[10] Prosser, Torts (3 ed.) § 47.

*Altman, Geraghty, Leonard & Mulally,* for appellant.
*Robins, Davis & Lyons* and *John F. Eisberg,* for respondents.

Heard before Knutson, C. J., and Nelson, Murphy, Otis, and Theodore B. Knudson, JJ.

MURPHY, JUSTICE.

Appeal from an order of the district court denying defendant's motion for a new trial in a medical malpractice action arising from a burn sustained by plaintiff Dorothy Synnott while in surgery. The issue is whether the negligent acts of an X-ray technician employed by defendant hospital, who utilized X-ray equipment and procedures prior to surgery, are to be imputed to the hospital as a matter of law. Defendant also contends that the trial court erred in permitting plaintiffs to call as an adverse witness under Rule 43.02, Rules of Civil Procedure, an employee

of defendant hospital who at the time of trial had been separated from her employment.

From the record it appears that plaintiff Dorothy Synnott was admitted as an emergency patient to the Midway Hospital following an accident which occurred at her home. The injury was diagnosed as an intertrochanteric fracture of the left hip. On the morning following her admission, her attending orthopedic surgeon, Dr. Donald P. Smiley, performed an operation described as a "closed reduction and open fixation of fracture with Jewett nail."

On the day following surgery, May 9, 1966, Mrs. Synnott complained of pain and was found to have a blister sore on the right hip. On May 10, 1966, the physician's comments in the hospital record state:

"* * * The area in the right thigh is weeping a little. This is mostly from the blister in the skin. * * * I have discussed the problem with the chief x-ray technician. The only thing that we can figure is that one of two things, either in attempting to [move] the x-ray machine to get better lateral views during surgery it was either the pressure against the thigh or the area of the machine where the light is touched the skin and sometimes does get rather warm. It is difficult to state in looking at this whether it is a pressure area or whether this is a blister from the light burn. Considering that there is one large area and two small areas about 1/2 inch in diameter next to it makes one wonder if this could not be a burn rather than a pressure area. If so the area should heal without any problem. The patient will be kept in bed until she is a little more comfortable."

Mrs. Synnott was discharged on June 8, 1966, and readmitted for treatment of the burn on June 22, 1966. She was subsequently discharged on July 16, 1966. The injury apparently occurred from contact with a guide-light attached to an X-ray machine. The operator of that machine was Mrs. Janet Salls, an X-ray technologist employed by defendant hospital. Her testimony,

which was adduced by cross-examination under the rules, was the only evidence relating to the circumstances which gave rise to the burn. She stated that she was summoned from her post in the X-ray department on May 8, 1966, by Dr. Smiley to take an X-ray of Mrs. Synnott's fracture. Preliminary to taking the X-ray film of the patient, who was already anesthetized prior to surgery, Mrs. Salls turned on a guide-light to facilitate positioning of the machine. The light was a simple 50-watt, 110-volt bulb. She testified that the light was on for only 3 or 4 minutes, and that she then turned it off. However, the machine was draped with a sterile cloth after she took the X ray, and it would have been possible for the light to remain on without that fact being observed by anyone in the operating room.

Mrs. Synnott was under anesthesia and was unable to relate the cause of her injury from the burn. The trial court applied the doctrine of res ipsa loquitur and directed a verdict against defendant hospital on the theory that the injury was caused by the negligence of the X-ray technician, imputable to defendant under the doctrine of respondeat superior. The trial court submitted the issue of damages to the jury, and it returned verdicts in favor of Mrs. Synnott and her husband, plaintiff George Synnott.

■ The issue presented requires an examination of the authorities as they bear on the liability of a hospital for negligence of its employee when such employee is engaged in an operating room procedure in the presence of the attending surgeon. The question arises as to whether the hospital is liable for the employee's negligent conduct under the doctrine of respondeat superior or whether under that doctrine the surgeon is liable for her conduct as a "borrowed servant." It appears from our authorities that generally, "when a hospital assigns its nurses to a duty for an operating surgeon in its operating room and surrenders to the surgeon the direction and control of the nurses in relation to the work to be done by them, the nurses become the servants of the operating surgeon insofar as their services

relate to the work so controlled and directed by the surgeon, and the hospital is no longer liable for torts committed in such controlled and directed work." Wallsted v. Swedish Hospital, 220 Minn. 274, 277, 19 N. W. (2d) 426, 428; St. Paul-Mercury Ind. Co. v. St. Joseph's Hospital, 212 Minn. 558, 4 N. W. (2d) 637.

Defendant deduces from this statement the proposition that a physician is responsible for every conceivable negligent act on the part of a hospital employee which arises during the course of an operation. Plaintiffs, on the other hand, contend that, by virtue of this court's holding in Swigerd v. City of Ortonville, 246 Minn. 339, 75 N. W. (2d) 217, the hospital may be liable whether or not its employee's actions were performed either at the personal direction or control of the attending physician or during the course of an operation if, in fact, her negligence occurred during the performance of a routine, administrative act. We cannot agree with the construction placed upon these authorities by either party.

In Swigerd v. City of Ortonville, *supra,* we attempted to delineate the respective liabilities of the hospital and the physician for the dereliction of a hospital employee. There we held that the physician was clearly liable under two circumstances: Where the actual control of the servant, or the right thereto, necessarily became vested in the surgeon by virtue of the fact that the employee is assigned to him during the actual performance of an operation over which he must have exclusive control, in so far as her services relate to the controlled work; and where the nurse is administering a prescribed treatment under the direct and personal supervision of the physician. We said that difficulties with regard to the borrowed-servant rule arose "primarily with respect to acts performed by hospital employees either before or after an operation, or performed in the course of administering medical treatment prescribed by a physician who is not present to give personal supervision." 246 Minn. 342, 75 N. W. (2d) 220. In resolving whether negligent acts performed before or after surgery or not in the presence of the attending physician

are imputable to the physician, we stated (246 Minn. 345, 75 N. W. [2d] 222):

"We adopt the rule that a hospital is liable for the negligence of its nurses in performing mere administrative or clerical acts, which acts, *though constituting a part of a patient's prescribed medical treatment,* do not require the application of the specialized technique or the understanding of a skilled physician or surgeon."

And we held (246 Minn. 346, 75 N. W. [2d] 222):

"* * * Routine acts of treatment which an attending physician may reasonably assume will be performed in his absence by nurses of a modern hospital as part of their usual and customery duties, and the execution of which does not require specialized medical knowledge, are merely administrative acts for which negligence in their performance is imputable to the hospital."

Difficulty is encountered in applying these rules since they do not necessarily anticipate the great variety of situations in which a hospital patient may be injured by the negligence of a physician, a nurse, or both. They must be applied in light of the particular facts in each case. Here it must be kept in mind that Mrs. Synnott's injury resulted from the negligent use of hospital equipment, the operation of which required skill and training on the part of the hospital employee. It must also be kept in mind that in the use of such equipment there was evidence of some direction and control by the attending physician.[1] It seems to us

---

[1] The evidence bearing on this phase of the proof derives from an examination of the X-ray technician, which includes the following questions and answers:

"Q. In your work do you as a technologist decide when or where to take x-rays of a patient?

"A. No, we do not.

"Q. Who generates the instruction to do work like that?

that the evidence presented a fact question as to whether the alleged negligent conduct of the technician occurred in her capacity as a hospital employee or whether, at the time the injury

---

"A.  The doctor; whether he be a GP or specialist, they always direct us.

*   *   *   *   *

"THE COURT:  Did Dr. Smiley assist you in aligning the machine?
"THE WITNESS:  Yes, he did.

*   *   *   *   *

"Q.  Who dismisses you from the room, and who tells you to come back?
"A.  The doctor.

*   *   *   *   *

"Q.  When you were called to return to the x-ray room on Mrs. Synnott's surgery, when you returned what were you instructed to do?
"A.  I was instructed to take another film.
"Q.  All right. And who gave you that instruction?
"A.  Dr. Smiley.

*   *   *   *   *

"Q.  How did Dr. Smiley assist you in lining up this machine, Mrs. Salls?
"A.  Well, he told me where the site of the injury was. He took the x-ray film from my hand, placed it, and he said 'Janet'—or whoever he's talking to, and said, 'I want you to direct the tube into the hip of Mrs. Synnott.'

*   *   *   *   *

"Q.  At the time that you took the scout film, did Dr. Smiley hold the film for you?
"A.  Yes. I mean he took the film from me, and there is an apparatus that is attached to the surgery table where the film is placed in that side, and he sort of manipulates this apparatus with the film. He puts it at the angle, wherever he thinks the film should be.

*   *   *   *   *

"Q.  * * * The movement and the direction and the placing of the tube was you. He did not assist you in doing that, did he?
"A.  He assisted me verbally, not physically.

*   *   *   *   *

"Q.  He's experienced in interpreting the film, but has he—he does not handle or deal with this machine, does he?
"A.  Well, he's done—a doctor that does hip pinning has done num-

occurred, she was the "borrowed servant" of the attending physician acting under his supervision and direction. We think it was for the jury to decide this question.

■ It is next contended that the court erred in permitting plaintiffs to call the X-ray technician for cross-examination under Rule 43.02, Rules of Civil Procedure.[2] Neither the technician nor the attending surgeon were named as defendants. Plaintiffs relied solely on cross-examination of the technician under the rule to establish their case. The question is not presented as to whether or not the trial court properly exercised its discretion in permitting plaintiffs to ask leading questions on the theory that the witness was unwilling or hostile. Defendant complains

---

erous hip pinnings and he's assisted x-ray technologists numerous times, and with his extensive training he always assists the x-ray technician.

"Q. Verbally.

"A. Verbally and sometimes physically.

\* \* \* \* \*

"Q. You don't stand there and wait until he says, 'Now, you are dismissed, Mrs. Salls.'

"A. Yes, he does. Unless he says for me to go I don't leave, because lots of times he's looking at the film and studying it and thinking about it, and then I stand there. I just don't walk out of the room.

\* \* \* \* \*

"Q. On the two occasions when you were inside that surgery room, did you take instructions from anyone other than Dr. Smiley?

"A. No, I did not.

"Q. Is he your boss while you were in there?

"A. That's right.

"Q. Whatever he said you would do.

"A. Yes. At no time does an x-ray technician go on their own accord. You're always under the direction of a doctor."

[2] Rule 43.02, Rules of Civil Procedure, provides in pertinent part: "A party may interrogate an unwilling or hostile witness by leading questions. A party may call an adverse party \* \* \* or employe \* \* \* and interrogate him by leading questions and contradict and impeach him on material matters in all respects as if he had been called by the adverse party."

that; because the technician had not been employed by the hospital for approximately 2 years prior to the trial, plaintiffs could only call her as their own witness and be bound by her testimony.

While the courts are divided on whether a witness must be an employee of an adverse party at the time of trial, as well as at the time of the incident involved in the trial, to invoke statutes or rules similar to Rule 43.02 (see, Annotations, 56 A. L. R. [2d] 1108 and 1 A. L. R. Fed. 693; Scott v. Del Monte Properties, 140 Cal. App. [2d] 756, 295 P. [2d] 947; O'Shea v. Jewel Tea Co. [7 Cir.] 233 F. [2d] 530), it is well settled in this state that to authorize the calling of an officer or subordinate employee of the adverse party for cross-examination under the rule he must be such at the time of the trial. It is not enough that he be such at the time the transaction occurred. 20 Dunnell, Dig. (3 ed.) § 10327; First State Bank of Ely v. Seliskar, 169 Minn. 321, 211 N. W. 163; Snelling State Bank v. Clasen, 132 Minn. 404, 157 N. W. 643, 6 A. L. R. 1663; Johnson v. Chicago & N. W. Ry. Co. 175 Minn. 197, 220 N. W. 602.

On the basis of the record before us, we are not warranted in considering a change or modification of the controlling authorities on this issue.

Reversed and new trial granted.