TINA LHOTKA, A MINOR, BY JAMES LHOTKA, HER FATHER AND NATURAL GUARDIAN, AND OTHERS v. DONALD M. LARSON AND OTHERS.

238 N. W. 2d 870.

January 30, 1976—No. 44875.

*Rischmiller & Wasche* and *Robert Wm. Rischmiller*, for appellants.

*Richards, Montgomery, Cobb & Bassford, Greer E. Lockhart,* and *Jon D. Jensvold,* for respondents Larson.

*Meagher, Geer, Markham, Anderson, Adamson, Flaskamp & Brennan, Robert M. Frisbee,* and *O. C. Adamson II,* for respondent Anderson.

*Lasley, Gaughan, Reid & Stich, Douglas Dale Reid, Jr.,* and *Robert T. Stich,* for respondent hospital.

Heard before Peterson, Kelly, and Chanak, JJ., and considered and decided by the court en banc.

SHERAN, CHIEF JUSTICE.

This is a malpractice action against the attending obstetrician and prescribing doctor, Donald M. Larson, M. D., his brother, Roger C. Larson, M. D., Swedish Hospital, and the anesthesiologist, William Anderson, M. D.[1] The trial court directed verdicts in favor of the hospital and the anesthesiologist. The jury returned a verdict in favor of the Doctors Larson. Plaintiffs appeal from an order denying their motion for a new trial. We affirm.

The Doctors Larson are specialists in obstetrics and gynecology. Karen Lhotka became a patient of theirs in May of 1966 and was seen intermittently by them from that time onward. Mrs. Lhotka disclosed a history of infertility, menstrual irregularity,

---

[1] The Doctors Larson are brothers who practice medicine together in a partnership.

and a miscarriage. Tests designed to pinpoint the cause of these abnormalities were recommended but never taken.

In June of 1969, it was determined that Mrs. Lhotka was pregnant. Her delivery date was estimated at February 10, 1970. Her pregnancy was generally unremarkable, except for a minor automobile accident, a large gain in weight, and a viral infection during the last week before delivery.

Mrs. Lhotka called her doctors twice on December 16, 1969. In the morning call, she complained of constipation. Dr. Roger Larson told her to take 2 tablespoonfuls of milk of magnesia if she did not have a bowel movement by evening. That evening Mrs. Lhotka informed Dr. Donald Larson by phone that she was having contractions and a "bloody show." He told her to go to the hospital. She was admitted to Swedish Hospital at 1:50 a. m. on December 17, 1969. Upon admission, she stated that she had given herself two enemas at home.

Dr. Donald Larson was advised of Mrs. Lhotka's admission by phone at 2:15 a. m. and was told that her cervix was 3 centimeters dilated. He ordered the oral administration of 3 grains of Seconal, which was given to Mrs. Lhotka orally at 2:20 a. m.[2] About 5 a. m., with Dr. Donald Larson now at the hospital, an X-ray which he had ordered taken disclosed a condition called polyhydramnios (excessive amniotic fluid). Dr. Larson ordered the administration of 50 milligrams of Demerol and 25 milligrams of Phenergan, which Mrs. Lhotka was given by intramuscular injection at 5:10 a. m.[3]

By 7 a. m. Mrs. Lhotka was fully dilated. Because premature delivery was anticipated, a local rather than general anesthetic was administered. Mrs. Lhotka also received oxygen from approximately 7 a. m. through delivery. At 7:22 a. m., Dr. Larson ruptured the amniotic sac and the baby, Tina, spontaneously de-

[2] Seconal is a brand of sodium secobarbital, a barbiturate. It is used as a sedative to ease apprehension.

[3] Demerol is a narcotic analgesic used to relieve pain. Phenergan is an obstetrical sedative.

livered at 7:23 a. m. Tina weighed 1,850 grams and appeared to be 6 or 7 weeks premature.

Tina could not breathe on her own at birth. She was given an Apgar rating of "one." [4] Within a minute or so of birth she was connected to a resuscitator which administered positive-pressure oxygen. Ten minutes after birth, 0.2 milligrams of Nalline were administered to the child. [5]

Between 7:30 and 7:35 the anesthesiologist, Dr. Anderson, arrived. He took over Tina's oxygenation. She took her first voluntary breath at 7:43 a. m. About 8:30 a. m. she was transferred to the newborn nursery, where she was under the care and observation of Verda Lundquist, a registered nurse employed by Swedish Hospital. Tina had a cyanotic episode at 10:30 that morning in the nursery. At 2:30 p. m. she was transferred to the Newborn Intensive Care unit at Hennepin County General Hospital, where she remained for approximately 80 days. She had a number of cyanotic episodes there. Tina's diagnosis is severe mental retardation with spastic quadroparesis and cerebral palsy. The condition is irreversible.

The issues on appeal are (1) whether plaintiffs were entitled to a specific jury instruction based on Mulder v. Parke Davis & Co. 288 Minn. 332, 181 N. W. 2d 882 (1970); (2) whether the trial court erred in directing a verdict in favor of defendant Swedish Hospital; and (3) whether the trial court erred in directing a verdict in favor of defendant William Anderson, M. D., the anesthesiologist.

■ In Mulder, we held:

"Where a drug manufacturer recommends to the medical profession (1) the conditions under which its drug should be pre-

---

[4] The Apgar rating indicated the child's condition. A perfect score is 10; a stillborn child would score 0. At birth, Tina's heart rate was slow, her color "blue," her muscle tone "flaccid," her respiratory effort "absent."

[5] Nalline is a synthetic narcotic typically used in the treatment of severe narcotic-induced respiratory depression.

scribed; (2) the disorders it is designed to relieve; (3) the precautionary measures which should be observed; and (4) warns of the dangers which are inherent in its use, a doctor's deviation from such recommendations is prima facie evidence of negligence if there is competent medical testimony that his patient's injury or death resulted from the doctor's failure to adhere to the recommendations." 288 Minn. 339, 181 N. W. 2d 887.[6]

The heart of plaintiffs' argument is that they were entitled to an instruction based on Mulder because Dr. Donald Larson knowingly deviated from the manufacturers' instructions and recommendations on the use of the drugs which were administered in this case. More specifically, plaintiffs charge that the use of Seconal was absolutely contraindicated in cases of premature labor; that the dosages of Demerol and Phenergan were excessive under the circumstances; and that the Nalline administered to Tina might have increased rather than decreased her respiratory depression. The theory of plaintiffs' case at trial was that the drugs administered to Mrs. Lhotka crossed the placental barrier and caused the depression of Tina's central nervous system and respiratory centers, which in turn caused the cyanotic episodes and the resultant brain damage.

Were this a case in which the manufacturers' instructions were clear and unambiguous, or were this a case in which deviations from them clearly took place, then a jury instruction based on Mulder might be appropriate.[7] But this is not such a case.

---

[6] We also noted in Mulder v. Parke Davis & Co. 288 Minn. 332, 340, 181 N. W. 2d 882, 887 (1970), that where the above described circumstances obtain, "it is incumbent on the doctor to disclose his reasons for departing from the procedures recommended by the manufacturer."

[7] A party is entitled to a specific instruction on his theory of the case if there is evidence to support it and if a proper request for the instruction has been made. Hagen v. Snow, 244 Minn. 101, 69 N. W. 2d 100 (1955); Luther v. Standard Conveyor Co. 252 Minn. 135, 89 N. W. 2d 179 (1958); Phillips v. G. N. Ry. Co. 257 Minn. 195, 100 N. W. 2d 765 (1960).

The manufacturer's instructions [8] concerning Seconal contained no warning against its *oral* use in premature delivery cases. Fetal immaturity constituted a contraindication only if the drug was administered parenterally (by injection).[9] The manufacturer's instructions also called for a reduction of at least 50 percent in the dosage of barbiturates administered "in the presence of" Phenergan. But here the barbiturate Seconal was administered *before* the Phenergan, and the instructions are silent on whether a reduction in the dosage of Phenergan is necessary in such circumstances. Despite the ambiguity, the dosage of Phenergan which Mrs. Lhotka received was only one-half the normal dosage.[10] The reduced dosage was ordered even though the Seconal had undoubtedly metabolized by the time the Phenergan was administered.[11] As for Nalline, one instruction cautioned against the use of more than one dosage; another exhibit stated that no more than three doses should be given. Tina received only a single dose.

---

[8] The term "manufacturers' instructions" will be used to denote generally all the information and exhibits introduced at trial by both sides which purported to establish the guidelines under which physicians would conduct themselves in the prescription and administration of the drugs in question. Chief among the exhibits introduced were the manufacturers' "inserts"—the printed use instructions which are "inserted" as part of the packaging of any given drug—and the 1969 Physicians' Desk Reference to Pharmaceutical Specialties and Biologicals, a standard medical reference work which summarized between its covers much of the information contained in the manufacturers' inserts.

[9] Even in cases of parenteral administration, the instructions were not clear. One exhibit stated that the parenteral use of Seconal was "generally contraindicated * * * if the fetus is premature," while another exhibit simply stated that "fetal immaturity constitutes a relative contraindication."

[10] The usual and recommended dosage of Phenergan in obstetrics is 50 mg. Mrs. Lhotka received 25 mg.

[11] Seconal's peak effectiveness occurs 1 to 2 hours after administration. It dissipates entirely within about 3 hours. Mrs. Lhotka was given the Seconal at 2:20 a. m.; the Phenergan was not administered until 5:10 a. m.

The foregoing suggests the ambiguity of the instructions which the Doctors Larson allegedly failed to follow. Where the instructions were clear, sufficient testimony was introduced to justify the jury's conclusion that the doctors had not deviated from them. For example, the manufacturer's instructions called for a one-quarter to one-half reduction in the dosage of Demerol when it was administered with Phenergan. The usual dosage of Demerol was 100 mg.; Mrs. Lhotka received 50 mg.[12] The recommended dosage of Nalline was 0.2 mg.; that was the amount administered to the child.[13]

We hold on these facts there was no basis in the manufacturers' instructions for a finding that the Doctors Larson failed to observe clear and explicit recommendations with respect to Seconal, Demerol, Phenergan, or Nalline.[14] Without such evidence, plaintiffs' requested jury instruction based on our decision in Mulder can have no application. The jury instruction given[15] in the case was therefore proper,[16] and this court will

[12] The manufacturer's instructions indicated that the usual adult dosage of Demerol was 50 to 100 mg. Uncontradicted testimony by Dr. Donald Larson indicated that in the brothers Larson's practice the usual dosage was 100 mg.

[13] The instructions on Nalline specifically stated that it could be used in newborn infants for the treatment of asphyxia resulting from maternal narcotization.

[14] Underlying Mulder is the self-evident premise that deviation from a manufacturer's recommendations constitutes prima facie evidence of negligence only when the conduct complained of deviates from standards which are clear and explicit.

[15] The trial court's instruction to the jury essentially followed the language of JIG II, 425, 4 Hetland & Adamson, Minnesota Practice, Jury Instruction Guides (2 ed.) p. 330.

[16] The trial court has considerable discretion to determine whether specific instructions should be given when the general charge fairly and correctly states the applicable law. Cameron v. Evans, 241 Minn. 200, 62 N. W. 2d 793 (1954); Manion v. Tweedy, 257 Minn. 59, 100 N. W. 2d 124 (1959). We have, however, discouraged the practice of giving an instruction which suggests to the jury specific inferences which might

not disturb the jury's verdict, especially where a plaintiff was permitted, as the plaintiffs were here, to present his evidence to the jury and to argue fully to them his theory of recovery.[17]

An added reason for our conclusion may be briefly noted. Even if this had factually been a Mulder-type case, the plaintiff still has the burden of proving that the defendant caused the injury. Here, at least a half-dozen causes other than the negligence of the Doctors Larson might have explained Tina Lhotka's condition.[18] The facts of the case suggest quite strongly that the jury verdict would have been no different even if a Mulder instruction had been given. We decline to reverse for failure to give an instruction which was not required and which even if given would not have made a difference in the result in this case.

■ As to the liability of defendant Swedish Hospital, it was plaintiffs' theory at trial that the hospital was liable because of the negligence of its employee, Verda Lundquist, R. N., who had the responsibility for caring for Tina in the hospital's nursery. Plaintiffs attempted to show that Nurse Lundquist negligently caused or exacerbated the cyanotic episode which Tina suffered in the nursery at 10:30 on the morning of her birth and that that episode contributed to Tina's injuries. The trial court directed

---

be drawn from a particular item of evidence. Boynton v. Simmons, 156 Minn. 144, 194 N. W. 330 (1923); Piepho v. M. Sigbert-Awes Co. 152 Minn. 315, 188 N. W. 998 (1922).

[17] Plaintiffs introduced expert medical testimony to the effect that the dosages administered to Mrs. Lhotka were inappropriate under the circumstances and inconsistent with good medical practice. This testimony was evaluated by the jury and rejected in favor of contrary testimony by defendants' experts, who testified that the drugs used and the dosages administered were in accordance with good practice. Plaintiffs acknowledged in a post-trial memorandum that they were permitted to argue their case to the jury.

[18] The possible explanations include: (1) The fact that brain defects are more common in infants born prematurely; (2) reproductive insufficiencies; (3) predelivery trauma; (4) congenital malformation; (5) postconception infections; (6) breathing stoppages which occurred at Hennepin County General Hospital.

a verdict for the hospital, emphasizing that plaintiffs had failed to show that Nurse Lundquist's negligence caused Tina's injuries. The record sustains the trial court's ruling, and we hold that plaintiffs failed to establish a, prima facie case against the hospital.

Plaintiffs' theory was that Nurse Lundquist either failed to observe in Tina signs which precede the onset of cyanosis, or that she failed to understand the significance of what she did observe. Timely observation or understanding, in plaintiffs' view, would have enabled Nurse Lundquist to summon help and prevent injury to Tina. Plaintiffs asserted that Nurse Lundquist's failure to do so made her causally negligent.

Testimony at trial indicated that certain symptoms [19] precede cyanotic episodes. Because the hospital records showed that the baby was "very dusky" at 10:30 a. m., and because Tina's chart contained no record of cyanotic symptoms or, for that matter, any record at all of her condition between 10 and 10:30 a. m., plaintiffs infer that Nurse Lundquist must have failed to observe changes which actually occurred.

Plaintiffs' expert witness testified that the standard of nursing care under the circumstances of this case called for the attending nurse to observe the patient at 15-minute intervals and to chart pulse and respiration readings and other vital signs at each observation. The standard has three aspects—observation, accurate monitoring of the patient's condition, and charting.

Plaintiffs' evidence was adequate to create a jury issue as to whether Nurse Lundquist deviated from the standard of care as to charting. The chart itself was introduced into evidence. It showed entries at approximately half-hour intervals rather than 15-minute intervals, and not all of the entries recorded all of Tina's vital signs. We agree with the trial court, however, that there was no evidence to show that the failure to chart was an actual cause of Tina's injuries.

---

[19] Symptoms of cyanosis include changes in color in the face and fingernails and alterations in respiration and pulse.

Nurse Lundquist herself was the only witness who had direct knowledge of the surveillance of Tina. She testified that she saw that the baby "was getting dusky" at 10:30 a. m., implying that the cyanotic condition was not advanced at the time she observed it. She also testified that she had observed Tina to the best of her physical ability continuously from 8:30 a. m. until 2:20 p. m.

Plaintiffs attempted to prove their case by impeaching Nurse Lundquist's testimony on these points. Nurse Lundquist, however, was plaintiffs' witness. Because she had left the hospital's employ prior to trial, the trial court properly ruled that plaintiffs could not call Nurse Lundquist for cross-examination under the rules, but were required to call her as their own witness. Synnott v. Midway Hospital, 287 Minn. 270, 178 N. W. 2d 211 (1970). Consequently, plaintiffs were bound by Nurse Lundquist's testimony as to her adherence to the applicable standard of care.

■ As to the liability of defendant Anderson, the anesthesiologist, plaintiffs contended that he too was negligent. Their argument is based on the testimony of Dr. Roger Larson, who stated that if a child unable to make independent respiratory efforts is properly oxygenated, brain damage could be avoided. Plaintiffs argue that because Dr. Anderson had primary responsibility for oxygenating the baby shortly after her birth, a jury could conclude that he must have oxygenated Tina improperly, as brain damage did occur.

The trial court directed a verdict in favor of Dr. Anderson, stating that the court would regard a jury verdict against the doctor as "unequivocally perverse." We agree. Plaintiffs failed to establish a prima facie case of negligence on the part of Dr. Anderson. The general rule in medical malpractice cases is that plaintiff must introduce expert medical testimony as to the standard of care and the defendant doctor's departure from it in order to create a jury issue. Silver v. Redleaf, 292 Minn. 463, 194 N. W. 2d 271 (1972); Hestbeck v. Hennepin County, 297 Minn. 419, 212 N. W. 2d 361 (1973). There are exceptions to the rule, but this is not one of them. Any finding of negligence on

the part of Dr. Anderson would be purely speculative. We hold that the trial court properly directed a verdict as to this defendant.

For the reasons stated, the results below are affirmed.

NICHOLAS S. CHANAK, JUSTICE,* (dissenting).

I dissent from the majority opinion to the extent it denies a new trial against defendant doctors, Donald and Roger Larson. The majority properly concedes that a jury instruction based on Mulder v. Parke Davis & Co. 288 Minn. 332, 181 N. W. 2d 882 (1970), would be appropriate in another case, but finds that the trial court committed no reversible error in refusing such an instruction here because (1) the drug manufacturers' recommendations were not sufficiently clear and explicit to support the requested instruction, and (2) the requested instruction would not have changed the verdict since Tina Lhotka's condition could have been the result of numerous other causes. I disagree on both of these grounds.

First, with respect to the clarity of the manufacturers' recommendations, the evidence is undisputed that Tina Lhotka was born prematurely; that Dr. Donald Larson knew or should have known from package inserts that "fetal immaturity constitutes a relative contraindication" for administration of Seconal by injection (Plaintiffs' exhibit K); that Dr. Donald Larson knew from the Physician's Desk Reference that Seconal, at least when administered by injection, is "generally" contraindicated if the fetus is immature; and that Dr. Donald Larson nevertheless prescribed the drug. The problem is that the Seconal was administered orally and the manufacturer's recommendations on oral administration (Plaintiffs' exhibit L) contain no explicit contraindication relative to fetal immaturity. In my view, a Mulder instruction should be given, contingent for its application upon

---

* Acting as Justice of the Supreme Court by appointment pursuant to Minn. Const. art. 6, § 2, and Minn. St. 2.724, subd. 2.

a prior finding by the jury as to whether the manufacturer's recommendations were sufficiently clear to put the reasonably prudent physician on notice that oral administration of Seconal was also contraindicated.

Jury instructions are often contingent upon prior findings of fact. The majority has apparently decided that such a contingent instruction is not justified here because there is not sufficient evidence from which a jury could find that a reasonably prudent physician would receive adequate notice from the manufacturer's recommendations. Yet, Dr. Roger Larson admitted that Seconal has "the same chemical composition" whether administered orally or by injection. Further, expert witness Dr. Milton Alter testified that the effect of the drug is known by the practicing physician to be the same, although the drug would metabolize more slowly when administered orally. On the basis of this evidence, a jury could find that Dr. Donald Larson should have known from the manufacturer's recommendations that oral administration of Seconal was also contraindicated. A Mulder instruction would then have been appropriate if the jury could make the further finding that Dr. Donald Larson's deviation from the manufacturer's recommendations on Seconal, alone or in combination with the subsequent administration of Demerol and Phenergan, caused Tina Lhotka's condition.

In this connection, the majority opinion states that a Mulder instruction was not required here because Tina Lhotka's condition may have been the result of other causes. However, Mulder only requires "competent medical testimony that his patient's injury or death resulted from the doctor's failure to adhere to the recommendations." 288 Minn. 340, 181 N. W. 2d 887. There was such competent testimony here in the expert opinion of Dr. Milton Alter. In effect, the majority concludes from the mere possibility of other causes that no jury could believe this competent expert opinion. This conclusion finds no support in the verdict below. The case was submitted to the jury on special interrogatories. The jury never reached the causation issue because

it found that Dr. Donald Larson had not been negligent in administering the drugs. On the negligence issue, a Mulder instruction could very well change the result by permitting the jury to measure Dr. Donald Larson's conduct against a higher standard of care.

For these reasons, I would reverse as to defendant doctors, Donald and Roger Larson, and remand for a new trial at which plaintiffs would be entitled to the following jury instruction:

1. You are instructed that before the plaintiff may recover he (she) must establish the following:

(a) A professional standard of conduct;

(b) That the defendant breached that professional standard;

(c) That defendant's breach in fact caused plaintiff's injuries;

(d) That plaintiff has in fact been injured.

2. You are instructed that where a drug manufacturer or other recognized authority *clearly* recommends to the medical profession (1) the conditions under which the drug should be prescribed; (2) the disorder it is designed to relieve; (3) the precautionary measures which should be observed; and (4) warns of the dangers which are inherent in its use, *then* you may consider such manufacturer's recommendations as establishing a professional standard of care.

3. You are further instructed that if the plaintiff has persuaded you by a preponderance of the evidence that the defendant has deviated from those recommendations then you may find that the defendant has breached his professional standard of care *unless* the defendant persuades you that such a deviation was justified under the circumstances of this particular case.

4. You are further instructed that if you find that defendant has breached his professional standard of care, *and* if you are persuaded by a preponderance of the evidence that this breach did in fact *cause* the plaintiff's injuries, then you may find defendant negligent.

KELLY, JUSTICE (dissenting).
I join in Mr. Justice Chanak's dissent.

TODD, JUSTICE (dissenting.)
I join in the dissent of Mr. Justice Chanak.

SCOTT, JUSTICE (dissenting).
I agree with the dissent of Mr. Justice Chanak.

MR. JUSTICE OTIS took no part in the consideration or decision of this case.