Barbara J. BORKA, Appellant,

v.

EMERGENCY PHYSICIANS PROFESSIONAL ASSOCIATION, et al., Defendants,

Richard C. Bertie, et al., Respondents.

No. CO–85–1085.

Court of Appeals of Minnesota.

Jan. 14, 1986.

Ralph S. Parker, II, Minneapolis, for appellant.

R.D. Blanchard, Laura S. Underkuffler, Minneapolis, for respondents.

Heard, considered and decided by FOLEY, P.J., and SEDGWICK and LANSING, JJ.

## OPINION

SEDGWICK, Judge.

Barbara J. Borka appeals the judgment dismissing her malpractice claim and the trial court's order denying her motion for judgment notwithstanding the verdict (JNOV) or new trial. We affirm.

## FACTS

Appellant Barbara Borka obtained an intrauterine device (IUD) for birth control at

the Coon Rapids Clinic on December 17, 1981.

On the morning of her appointment with Dr. Richard Bertie (respondent) to have the IUD inserted, appellant discovered that her period had slowed and then stopped. This was abnormal for her.

Appellant testified that she called the clinic to ask whether she should postpone her appointment and wait until her next period. She testified that when she called the clinic, Dr. Bertie's nurse put her on hold to ask the doctor whether she should still come in for the IUD insertion. The nurse returned, stated there was no problem, and said that she should come in as scheduled. Neither Dr. Bertie nor the nurse recalled any such phone conversation.

Appellant testified that when she came in for the appointment, the doctor did not ask any questions about her current period or recent sexual activity. Nor did he discuss with her the patient information booklet. Appellant, however, did know that the IUD would be inserted only during the menstrual period.

Respondent testified that prior to inserting the IUD he asked appellant whether she was having a normal period. He also warned her of the major problems associated with the IUD, including increased menstrual flow and cramping, and the more serious but less frequent possibilities of perforation of the uterus, pelvic infection, and problems with any pregnancy that might result while on the IUD. Appellant admits respondent advised her of the risks of the IUD.

Respondent admitted he did not ascertain whether appellant signed the consent form accompanying the patient insert information. Whether appellant received the information is disputed.

The physician information accompanying the Searle Copper-7 IUD used here included the following precautions for the physician:

1. *Patient counseling.* Prior to the insertion the physician, nurse or other trained health professional must provide the patient with the Patient Brochure. The patient should be given the opportunity to read the brochure and discuss fully any questions she may have concerning the Cu-7 as well as other methods of contraception.

2. *Patient evaluation and clinical considerations.* (a) A complete medical history should be obtained to determine conditions that might influence the selection of an IUD. A physical examination should include a pelvic examination, Pap smear, gonorrhea culture and if indicated, appropriate tests for other forms of genital disease. The physician should determine that the patient is not pregnant.

b) The uterus should be carefully sounded prior to the insertion * * *

d) To reduce the possibility of insertion in the presence of an existing undetermined pregnancy, the optimal time for insertion is the latter part of the menstrual flow or one or two days thereafter.

On January 1, 1982, appellant was in great pain and called Dr. Underwood, a gynocologist at the clinic. She was admitted to Mercy Medical Center, where she had a miscarriage.

Appellant had problems with bleeding until March 9, 1982, when she went to the Mayo Clinic for a third dilation and curettage (D & C). After this time, appellant obtained further medical and psychological treatment.

### ISSUE

Did the trial court err by refusing to instruct the jury on the effect of a physician deviating from the drug manufacturer's guidelines, pursuant to *Mulder v. Parke Davis & Co.*, 288 Minn. 332, 181 N.W.2d 882 (1970)?

### ANALYSIS

The trial court instructed the jury using JIG II 425 G–S, which provides:

In performing professional services for a patient, a doctor must use that degree of skill and learning which is normally possessed and used by doctors in good standing in a similar practice in similar communities and under like circumstances. In the application of this skill and learning the doctor must also use reasonable care. The fact, standing alone, that a good result may not have followed from the treatment by the defendant is not evidence of negligence or unskilled treatment. A doctor is not a guarantor of a cure or a good result from his treatment and he is not responsible for an honest error in judgment in choosing between accepted methods of treatment.

Appellant argues that an instruction should have been given regarding a physician's deviation from drug manufacturers' recommendations. *See Mulder v. Parke Davis & Co.*, 288 Minn. 332, 181 N.W.2d 882 (1970).

In *Mulder*, a physician treated Helen Mulder for an infection in her left ear. He treated her with chloromycetin, but did not follow the dosage recommended by the manufacturer.

The manufacturer's guidelines warned physicians that the drug should not be used when other less potentially dangerous agents would be effective; cautioned that adequate blood studies be made during treatment; and warned that serious problems, including aplastic anemia, could result from short and long term therapy with the drug. This information apparently did not come to the physician's attention. Blood tests were not taken on Mulder. After treatment with chloromycetin, Mulder died of gastrointestinal hemorrhage resulting from bone marrow depression (aplastic anemia).

The Minnesota Supreme Court reversed a directed verdict in favor of the physician. It held:

Where a drug manufacturer recommends to the medical profession (1) the conditions under which its drug should be prescribed; (2) the disorders it is designed to relieve; (3) the precautionary measures which should be observed; and (4) warns of the dangers which are inherent in its use, a doctor's deviation from such recommendations is prima facie evidence of negligence if there is competent medical testimony that his patient's injury or death resulted from the doctor's failure to adhere to the recommendations.

*Mulder v. Parke Davis & Co.*, 288 Minn. 332, 339–40, 181 N.W.2d 882, 887 (1970).

The *Mulder* decision was discussed in *Lhotka v. Larson*, 307 Minn. 121, 238 N.W.2d 870 (1976). There, the Minnesota Supreme Court approved a trial court's decision not to give a *Mulder* instruction where the drug company's instructions to physicians were not clear and where it was not clear the physician's dosage of a drug caused the injury to the patient.

Even if this had factually been a *Mulder*-type case, the plaintiff still has the burden of proving that the defendant caused the injury. Here, at least a half-dozen causes other than the negligence of the Doctors Larson might have explained Tina Lhotka's condition.

*Id.* 238 N.W.2d at 875 (footnote omitted).

■ When the general charge fairly and correctly states the applicable law, the trial court has considerable discretion to determine whether a specific instruction should be given. *Id.* 238 N.W.2d at 875, n. 16 (*citing Cameron v. Evans*, 241 Minn. 200, 62 N.W.2d 793 (1954); *Manion v. Tweedy*, 257 Minn. 59, 100 N.W.2d 124 (1959)).

■ A *Mulder* instruction was not warranted here. To receive that instruction, (1) there must be sufficient evidence that Dr. Bertie deviated from the drug company's recommendations on counseling and administering the IUD, and (2) there must be competent testimony that such deviation caused the injury.

First, this case is factually quite different from *Mulder*. There, the physician totally failed to follow clear instructions regarding dosage and blood tests. Mulder's aplastic anemia was the direct result of the drug administered. Blood tests would

have detected the problem. Failure to use these tests as directed by the manufacturer resulted in Mulder's death.

Here, respondent absolutely adhered to the manufacturer's directions regarding time and method of insertion of the IUD. He observed the presence of menstrual bleeding. He also performed a sounding of appellant's uterus, which was within the normal range for size and did not indicate pregnancy. In addition, the pathologist's report indicated that at the time of the miscarriage the fetus was approximately 4 weeks old. The fetus would have been approximately 2 weeks old at the time the IUD was inserted. All the trial experts agreed that pregnancy testing (including the serum pregnancy test) could fail to detect a pregnancy at such an early stage.

Respondent warned appellant of the possible major and minor risks of IUD usage and believed that she understood those risks. Since Dr. Bertie conformed with the instruction to minimize the risk of pregnancy by inserting the IUD during the menstrual cycle, he did not deviate from the manufacturer's instructions.

Secondly, to warrant a *Mulder* instruction, a causal link must exist between the physician's departure from the manufacturer's recommendations and the patient's injury. That link was not established here. Therefore, the trial court properly denied the *Mulder* instruction.

We also note that the manufacturer's instruction sheets were received into evidence in their entirety. Appellant's counsel could argue that deviation from them was negligence under the general instruction given. It was not reversible error to refuse a specific instruction. *Conover v. Northern States Power Co.*, 313 N.W.2d 397 (Minn.1981).

Appellant argues that the trial court should have given instructions to correct "erroneous" testimony by defendant's experts regarding the standard of care. Appellant's counsel elicited the testimony on cross examination. There was no objection to this testimony and no motion to strike. The trial court gave the proper jury in-struction regarding the standard of care under Minnesota law. This was adequate. There was no error.

## DECISION

We affirm the decision of the trial court.