# ALBERT E. MULDER, TRUSTEE FOR HEIRS OF HELEN C. MULDER, v. PARKE DAVIS & COMPANY AND ANOTHER.

181 N. W. (2d) 882.

October 9, 1970—No. 42004.

*LeVander, Zimpfer & Tierney* and *Frank E. Monson,* for appellant.

*Faegre & Benson* and *G. Alan Cunningham,* for respondent Parke Davis & Company.

*Meagher, Geer, Markham & Anderson, Mary Jeanne Coyne,* and *O. C. Adamson II,* for respondent Mork.

*Dorsey, Marquart, Windhorst, West & Halladay, Henry Halladay, James H. O'Hagan,* and *Jan D. Stuurmans,* for Minnesota State Medical Association, amicus curiae.

Heard before Knutson, C. J., and Nelson, Otis, Rogosheske, and James F. Murphy, JJ.

OTIS, JUSTICE.

This is an action for death by wrongful act against the prescribing doctor and the manufacturer of a drug sold under the trade name of "chloromycetin." The trial court directed verdicts in favor of both defendants. Plaintiff appeals from an order denying his motion for a new trial. We affirm as to defendant Parke Davis and reverse as to defendant Frank E. Mork.

The facts are not in dispute. On June 24, 1965, decedent, Helen C. Mulder, consulted defendant Mork, a general practitioner, for an infection in her left ear. She was treated with penicillin but did not improve and returned 4 days later. Her condition was diagnosed as acute purulent otitis media. On that occasion, Dr. Mork took a culture which he tested with 15 antibiotics and found the most effective to be chloromycetin. He thereupon prescribed one 250-milligram capsule 4 times daily for 4 days. On July 2 Mrs. Mulder showed improvement and her prescription was renewed. However, she returned on September 22 and was treated by another doctor in defendant's clinic. It was found she had an exacerbation of otitis in her right ear. Again her prescription for chloromycetin was renewed. Three days later when

she saw Dr. Mork, he took a hemoglobin test and prescribed the same treatment. About a week later, her left ear gave her trouble again and Dr. Mork repeated the prescription of chloromycetin. On January 10, 1966, the last time she was seen by Dr. Mork, he discovered she had been hemorrhaging in her arms, legs, and breast. She was sent to Mercy Hospital. There, the pathologist, Dr. Jose Sanchez, found that Mrs. Mulder was suffering from severe anemia and profound bone marrow depression. Shortly thereafter, she was removed to the Veterans Administration Hospital, where she died on January 29, 1966. Death resulted from gastrointestinal hemorrhage due to aplastic anemia or bone marrow depression.

The issues are (1) whether the condition which caused Mrs. Mulder's death resulted from ingesting chloromycetin; (2) whether Parke Davis was negligent in failing to give adequate warning of the drug's dangerous propensities; and (3) whether Dr. Mork was negligent in prescribing the drug to this patient.

■ With respect to the claim against Parke Davis, plaintiff alleges the company was negligent in putting a dangerous drug on the market without giving adequate warning as to its use. More particularly, it is asserted that defendant's so-called "detail men," who called on doctors, failed to mention dosage, length of therapy, level of concentration of the drug in the blood, or side effects of the drug. Although "stuffers" which accompanied chloromycetin and the so-called physicians' desk reference gave adequate warning, plaintiff claims they did not come to the doctor's attention. The warning which Parke Davis gave is as follows:

"WARNING

"Serious and even fatal blood dyscrasias (aplastic anemia, hypoplastic anemia, thrombocytopenia, granulocytopenia) are known to occur after the administration of chloramphenicol. Blood dyscrasias have occurred after both short-term and prolonged therapy with this drug. Bearing in mind the possibility that such reactions may occur, chloramphenicol should be used

only for serious infections caused by organisms which are susceptible to its antibacterial effects. Chloramphenicol should not be used when other less potentially dangerous agents will be effective, or in the treatment of trivial infections such as colds, influenza, or viral infections of the throat, or as a prophylactic agent.

"Precautions: It is essential that adequate blood studies be made during treatment with the drug. While blood studies may detect early peripheral blood changes such as leukopenia or granulocytopenia, before they become irreversible, such studies cannot be relied on to detect bone marrow depression prior to development of aplastic anemia."

Dr. Mork testified on cross-examination that he was familiar with the information contained in the Parke Davis warning at the time he prescribed chloromycetin for Mrs. Mulder. Although he was aware of the dosage recommended, in this case he chose not to be governed by it. At the conclusion of the plaintiff's case, in response to the motion for a directed verdict, the court said, "There is no claim that it [chloromycetin] shouldn't be on the market." Plaintiff's counsel responded, "No. Just the matter of the warning. We rely on the warning, Judge. We feel that there is a fact issue on the question of whether or not the doctor did know."[1] The court then pointed out that the doctor had testified he was aware of the side effects and possible complications in the use of chloromycetin, one of which was the dyscrasia experienced by Mrs. Mulder. Counsel did not dispute the court's understanding of the evidence. Thereupon the court directed a verdict in favor of Parke Davis.

We agree that where the only issue is failure to communicate a warning, the manufacturer is not liable if the doctor was fully aware of the facts which were the subject of the warning. Wes-

---

[1] The manufacturer has no duty to warn the lay public regarding prescription drugs. Stottlemire v. Cawood (D. D. C.) 213 F. Supp. 897, 899; Love v. Wolf, 226 Cal. App. (2d) 378, 395, 38 Cal. Rptr. 183, 193.

terberg v. School Dist. No. 792, 276 Minn. 1, 8, 148 N. W. (2d) 312, 316; Magee v. Wyeth Laboratories, Inc. 214 Cal. App. (2d) 340, 351, 29 Cal. Rptr. 322, 328. As the court said in Magee:

"* * * Failure [of the doctor] to follow an unchallenged method of use prescribed by the manufacturer constitutes a break in causation which exonerates the manufacturer from any liability."

Accordingly, we hold that it was proper for the trial court to direct the verdict in favor of Parke Davis.

■ With respect to the directed verdict in favor of Dr. Mork, we are confronted with the typical difficulties experienced in malpractice actions. All too frequently, and perhaps understandably, practicing physicians are reluctant to testify against one another. Unfortunately, the medical profession has been slow to fashion machinery for making impartial and objective assessments of the performance of their fellow practitioners. Consequently, in actions of this kind claimants are required to rely on licensed physicians who are not in the mainstream of the practice. This is such a case. None of the three witnesses for plaintiff was in active practice. Dr. Jose Sanchez was a 1955 graduate of the University of San Marcos Medical School, Lima, Peru. His practice was confined principally to pathology, more particularly as a member of the staff of various hospitals. He was the pathologist at Mercy Hospital when Mrs. Mulder was given a blood test in January 1966. Dr. John Wild was educated in England and has been licensed to practice in Minnesota since 1952. He did not maintain an office and saw only occasional private patients. His principal experience was in clinical research to develop electronic diagnostic devices. Dr. Abraham Falk has been licensed in Minnesota since 1957 and has devoted nearly all of his career to acting as chief of staff at the Veterans Administration Hospital except for 5 years' association with The Group Health Plan in St. Paul.

It is obvious from a reading of the transcript that very early

in the trial a clash of personalities developed between the court and Dr. Wild, who assumed an attitude of levity which the court, with justification, found inappropriate. Dr. Wild was not permitted to give any professional opinion regarding the care and treatment of Mrs. Mulder or the professional standards which obtained in the community as they bore on the issues of this case. Without protracting our opinion by a detailed recitation of the evidence which plaintiff sought to elicit, we are satisfied the court did not abuse its discretion in excluding the proffered testimony. In the areas with which the court was concerned, Dr. Wild did not have the experience, training, or background adequate to furnish a proper foundation for the opinions counsel sought to evoke. While we do not encourage an illiberal attitude toward the kind of foundation which must be established for expert testimony in actions such as this, we cannot say that Dr. Wild demonstrated qualifications which made his testimony admissible as a matter of law. Swanson v. Chatterton, 281 Minn. 129, 136, 160 N. W. (2d) 662, 667.

With respect to the testimony of Dr. Sanchez and Dr. Falk, the court was equally strict. Again, however, without cataloging the particular rulings involved, we hold that the court did not exceed its discretion in insisting that a broader foundation be established for the expert testimony which was offered and rejected. Nevertheless, we have concluded that the testimony of Dr. Sanchez and Dr. Falk did establish a prima facie case of malpractice which it was error to remove from the jury.

■ Plaintiff presents four basic claims in seeking to impose liability on Dr. Mork. First, he asserts that defendant was negligent in prescribing chloromycetin without being familiar with its dangers. He contends that the drug was inappropriate for any except a serious affliction. Second, Dr. Mork had a duty to prescribe a less dangerous drug for the kind of infection from which Mrs. Mulder was suffering. Third, it was negligent to prescribe a dosage which was not recommmended by the manufacturer, was insufficient to cure the infection, resulted in pro-

longing Mrs. Mulder's treatment, and caused the aplastic anemia or bone marrow depression from which she died. Fourth, the doctor was negligent in failing to make blood tests which would have disclosed the lethal effect chloromycetin had on Mrs. Mulder in time to correct it.

There was competent testimony by Dr. Sanchez that the administration of chloromycetin occasionally results in aplastic anemia and bone marrow depression and that this was the cause of Mrs. Mulder's death. In addition, he testified that blood tests would indicate early bone marrow depression, but he was not permitted to state whether such tests would have disclosed that condition in Mrs. Mulder.

Dr. Falk was permitted to testify about procedures followed by the ordinary skillful and careful practitioner in Minnesota concerning blood tests for patients being treated with chloromycetin.[2] He stated that the proper practice was to take a white count before, during, and at the end of therapy. This, Dr. Mork did not do. With respect to the correct dosage, Dr. Falk testified that the proper practice for one not familiar with chloromycetin was to follow the advice given by the manufacturer. That testimony was subsequently stricken as not the proper standard. For two reasons we hold it was error not to permit the answer to stand. First, it was perfectly competent for the witness to state that a careful practitioner would follow the manufacturer's direction if he was not familiar with the drug; and, secondly, the manufacturer does have a far better opportunity than the ordinary practitioner to know and understand how and when its own product should be used.

Later, Dr. Falk was permitted to testify that where an inadequate dose of chloromycetin was prescribed it would not stop the infection and that "in view of this infection and the known toxicity of the drug, it's my opinion this would not have been used" in this particular instance by the ordinary skilled physician in Minnesota. On cross-examination he modified his answer

---

[2] Hoffman v. Naslund, 274 Minn. 521, 531, 144 N. W. (2d) 580, 589.

by conceding that doctors do deviate from manufactuers' recommendations in particular situations. However, he felt that a doctor should prescribe a drug which has the least risk of toxicity and is still effective.

In granting Mork's motion for a directed verdict, the court stated there was no evidence to establish the standard of the profession with respect to giving the drug chloromycetin under the conditions described and no evidence to show Mrs. Mulder's death was caused by the failure to take the blood test. While we agree that the testimony is not strong, it was adequate to make a prima facie case. Where the dosage is prescribed by the manufacturer, testimony of the physician's failure to adhere to its recommendation is sufficient evidence to require him to explain the reason for his deviation. This is particularly true where the manufacturer's warning puts the doctor on notice of potentially lethal effects. Magee v. Wyeth Laboratories, Inc. *supra.* We think that the testimony was also adequate to make an issue of whether it was negligence not to take periodic blood tests where the possibility of aplastic anemia was or should have been evident to the doctor. Consequently, we reverse and remand for a new trial as to defendant Mork.

Affirmed as to defendant Parke Davis. Reversed for a new trial as to defendant Mork.

UPON PETITION FOR REHEARING

On December 18, 1970, the following opinion was filed:

PER CURIAM.

In response to a petition of Minnesota State Medical Association as amicus curiae for a rehearing and clarification of the above opinion we expand on our decision as follows:

Where a drug manufacturer recommends to the medical profession (1) the conditions under which its drug should be prescribed; (2) the disorders it is designed to relieve; (3) the precautionary measures which should be observed; and (4) warns of the dangers which are inherent in its use, a doctor's

deviation from such recommendations is prima facie evidence of negligence if there is competent medical testimony that his patient's injury or death resulted from the doctor's failure to adhere to the recommendations.

Under such circumstances, it is incumbent on the doctor to disclose his reasons for departing from the procedures recommended by the manufacturer. Although it will ordinarily be a jury question whether the doctor has justified or excused his deviation, there may be situations where as a matter of law the explanation exonerates him unless rebutted by other competent medical testimony.

The petitions for rehearing are otherwise denied.

MR. JUSTICE KELLY, not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.