Harvey R. **TODALEN**, Respondent (C0–87–1690), Appellant (C4–87–2065),

v.

**UNITED STATES CHEMICAL COMPANY**, Defendant and Third Party Plaintiff, Appellant (C0–87–1690), Respondent (C4–87–2065),

v.

**GEO. A. HORMEL & COMPANY**, Third Party Defendant, Respondent (C0–87–1690), Appellant (C4–87–2065).

Nos. C0–87–1690, C4–87–2065.

Court of Appeals of Minnesota.

May 3, 1988.

Review Denied June 29, 1988.

Michael S. Kreidler, Minneapolis, for U.S. Chemical Co.

Gary E. Leonard, Donald K. Swanson, Austin, for respondents-appellants.

Heard, considered and decided by KALITOWSKI, P.J., and RANDALL and CRIPPEN, JJ.

## OPINION

KALITOWSKI, Judge.

This matter involves two appeals. The first is from the trial court's judgment holding United States Chemical Company (Chemical) liable to George A. Hormel and Company (Hormel) for contribution of workers' compensation benefits in an employer's subrogation action brought pursuant to the Minnesota Workers' Compensation Act, for recovery of benefits paid to Harvey Todalen, an employee of Hormel. *See* Minn.Stat. § 176.061 (1986). The subrogation action arises from a claim of products liability, specifically failure to warn.

The second appeal is from the trial court's ruling disallowing certain taxable costs and disbursements to Hormel, as the prevailing party. We affirm.

## FACTS

The facts concerning this matter are generally agreed upon by the parties. This action arises out of work-related injuries sustained by Harvey Todalen at the Hor-mel plant in Austin, Minnesota, on October 3, 1980.

Harvey Todalen began working for Hormel in 1945. For the last six years of his employment, Todalen's job as a smokehouse operator was to prepare meat for smoking, bring it into the smokehouse and set the controls to allow the smoking process to begin.

The smoking process resulted in a build-up of creosote and other materials within the smokehouses which had to be cleaned out. Usually the smokehouses were cleaned by other employees working the night shift, but if the smokehouses were not cleaned when Todalen arrived he was required to clean them.

The product used by Hormel to clean the smokehouse was Caustic 234 which is manufactured by Chemical. The principal ingredient of Caustic 234 is sodium hydroxide, a highly corrosive material. Caustic 234 is shipped in a dry state and has the appearance of coarse salt.

The cleaning process employed by Hormel is extensive. The smokehouses are constructed with external tanks, in which the Caustic 234 is mixed with cold water and then channeled into another tank in which the whole mixture is heated. From this heated tank the mixture is delivered to the smokehouses through a series of pipes. Upon arrival, the solution is dispersed through the smokehouse from nozzles located therein. The obvious design and application of the process is to prevent the operators from coming in contact with the Caustic 234 solution.

All parties involved knew Caustic 234 was dangerous. Hormel employees were instructed to wear protective equipment whenever handling Caustic 234. However, Todalen stated the employees of Hormel rarely used the safety equipment when using Caustic 234 in the dry state. He claimed the safety equipment was only for protection when using Caustic 234 and water because of the possibility of splashing.

On the date of the accident, Todalen discovered the floor drain in one of the smokehouses was clogged. He knew the procedure was to report the trouble to the main-

tenance department for repair. He testified he had reported the slow drain to the maintenance department a week earlier. He also knew other employees would sprinkle dry caustic on the floor to remove tough stains. He decided to put a small amount of Caustic 234 down the drain, hoping to solve the problem. He knew caustics were used in drain cleaners he used at home. He was in the process of pouring Caustic 234 down the drain when an exothermic reaction occurred, causing the chemical to flash back into his face. As a result of exposure to the chemical, Todalen suffered second and third degree burns to his face. Injuries sustained include loss of an ear, loss of sight in one eye, 50% loss of sight in his other eye, and significant cosmetic injuries.

Chemical and Hormel's chemists knew of the properties and propensities of Caustic 234. All knew Caustic 234 could cause severe burns and dissolve skin. More importantly, they knew it would cause an exothermic reaction when mixed with water, and could cause eruptions and violent splattering. The warning label placed on the drum of Chemical's Caustic 234 used by Todalen did not contain a caution regarding those particular properties or hazards. In addition, Hormel had a practice of ordering material safety data sheets on all of its hazardous chemicals. The data sheet provides vital information on the chemical formula, violent propensities of the formula and how to deal with accidents involving the chemical. The data sheet supplied by Chemical did not warn of risks of eruption or violent splattering.

Hormel, as a statutory subrogee of Todalen, commenced this action in Todalen's name. Todalen had asserted a claim against Chemical. However before an action was commenced by Todalen, a *Naig* settlement was reached between Todalen and the insurer for Chemical. Hormel's original complaint includes claims of negligence, strict liability and breach of warranty against Chemical. At the time of trial, Hormel elected to proceed on a negligence theory, specifically alleging that Chemical was negligent in failing to warn of risks connected with foreseeable use of Caustic 234.

Chemical impleaded Hormel, on the theory Hormel had not maintained a safe work place, and was therefore contributorily at fault for Todalen's injuries. Chemical further defended on the ground Todalen was contributorily at fault.

The jury found Todalen, Hormel and Chemical negligent and apportioned the negligence as follows: Todalen, 20%; Chemical, 40%; and Hormel, 40%. The trial court, based upon the jury's findings, ruled Chemical must pay Hormel a percentage of its subrogation interest. The trial court further ruled Hormel's total subrogation interest was equal to the workers' compensation benefits paid to Todalen which, by stipulation, were $336,813.92. The trial court ruled Chemical was responsible to Hormel for 40% of Hormel's subrogation interest, $134,725.57.

On appeal, Chemical claims: (1) there was not sufficient evidence to prove it could reasonably foresee the misuse to which its product was put by Hormel and its employee; (2) it has no legal duty to warn Hormel of the hazards incidental to the particular misuse to which its product was put by the employee in this case, inasmuch as Hormel had superior knowledge of this particular misuse and of the particular hazards incidental to such misuse; (3) its contribution claim against Hormel should have been based upon the total damages sustained by the employee, and this amount should be directly offset against Hormel's subrogation interest; (4) the employer's subrogation claim should not have included the permanent total disability benefits which it paid to the employee, including the present value of such future benefits, past the employee's retirement date, and (5) its fault should be compared to the aggregate fault of the employer and employee for purposes of the Minnesota Comparative Fault Act resulting in the aggregate fault of the employer and employee exceeding its fault, thus precluding recovery.

In its appeal, Hormel as the prevailing party claims the trial court erred in not

awarding all of its claimed costs and disbursements.

## ISSUES

1. Did the trial court err in denying Chemical's motions for directed verdict and for judgment notwithstanding the verdict?

2. Did the trial court err when it found as a matter of law Chemical had a duty to warn of hazards involved with its chemical, Caustic 234?

3. Did the trial court err when it found as a matter of law a defendant's right of contribution in an employer's subrogation action pursuant to Minn.Stat. § 176.061 should be based on the total amount of workers' compensation awarded, notwithstanding the execution of a *Naig* release or a jury's determination of damages?

4. Did the trial court err when it found as a matter of law in an employer's subrogation action the employer's negligence should not be aggregated with the employee's negligence for purposes of applying Minnesota's comparative fault law?

5. Did the trial court err in refusing to allow as taxable costs and disbursements certain costs incurred by Hormel as the prevailing party?

## ANALYSIS

1. *Denial of directed verdict and JNOV.*

Directed verdicts are appropriate only in exceptional cases. *Walton v. Jones,* 286 N.W.2d 710, 714 (Minn.1979). *Garner v. Todd,* 361 N.W.2d 459, 460 (Minn.Ct.App. 1985). The supreme court has stated the standard for determining whether to direct a verdict is "essentially whether different persons could reasonably come to different conclusions after viewing the evidence as a whole in the light most favorable to the nonmoving party." *Lakehead Constructors, Inc. v. Roger Sheehy Company,* 304 Minn. 175, 178, 229 N.W.2d 514, 515–16 (1975). *In Midland National Bank v. Perranoski,* 299 N.W.2d 404 (Minn.1980), the supreme court stated:

A motion for a directed verdict presents a question of law regarding the sufficiency of the evidence to raise a fact question for the jury's decision.

*Id.* at 409.

With the foregoing in mind this court must determine whether there was sufficient evidence to justify the presentation to the jury as a fact question the reasonable foreseeability of Todalen's use of Chemical's product. This court's review of the sufficiency of the evidence is independent of the trial court's decision. *Citizen's National Bank of Willmar v. Taylor,* 368 N.W.2d 913, 917–20 (Minn.1985).

 In the present case, the trial court was correct in denying Chemical's motion for directed verdict as the evidence admitted at trial was sufficient to present a factual question for the jury to decide. All parties agree Caustic 234 contains chemicals requiring careful handling. Todalen's knowledge of the specific contents and uses for Caustic 234 came from the label on the drum delivered from Chemical. Though approved only for soap tanks, Todalen and other employees commonly sprinkled dry Caustic 234 on the floors of the smokehouses to remove stubborn stains. In addition, Todalen testified he used the product to clean drains on several occasions without experiencing problems of eruption. From past experiences Todalen concluded as long as the chemical was in its dry state there was not a particular hazard and there was no reason to use full protective equipment. Todalen testified it was his general practice to use protective equipment whenever Caustic 234 was mixed with water due to splashing. The record shows he had no knowledge or concern for an exothermic reaction. For that reason Todalen's conclusions and actions concerning the uses of Caustic 234 and Chemical's ability to foresee Todalen's actions regarding its chemical presented a jury question.

The trial record also established Chemical knew of the risk of exothermic reaction. Chemical knew Caustic 234, with its high level of sodium hydroxide (76%), would erupt violently with water if confined in a small area. Chemical also knew caustic chemicals in general and sodium hydroxide

in particular were common in ordinary household drain cleaners. Furthermore, Chemical knew Caustic 234 would be used by workers having no specific knowledge of chemistry or the properties and propensities of caustic compounds.

The trial court did not err when it found there is sufficient evidence to allow the case to go to the jury. The supreme court has said that only in the most unequivocal of cases should a motion for directed verdict or for judgment notwithstanding the verdict be granted. *Citizens National Bank v. Taylor*, 368 N.W.2d 913, 917 (Minn.1985); *Walton v. Jones*, 286 N.W.2d 710, 714 (Minn.1979). The jury's verdict should be upheld unless the evidence is practically conclusive against the verdict. Only where no reasonable minds could reach a conclusion in agreement with the verdict may a jury verdict be overturned. *Peppin v. W.H. Brady Co.*, 372 N.W.2d 369, 374 (Minn.Ct.App.1985).

The evidence is not unequivocally in Chemical's favor. As has been shown, there was sufficient evidence to present to the jury the reasonable foreseeability of the use of Chemical's product and resultant injury. In addition, the jury's verdict is consistent with the law applicable to the case. The evidence is not against the verdict. The denial of Chemical's motion for judgment notwithstanding the verdict was proper.

### 2. *Duty to warn.*

 A duty to warn rests directly on foreseeability of the injury. *Balder v. Haley*, 399 N.W.2d 77, 81 (Minn.1987). There must be a duty to warn of a danger inherent in the item to be used before there will be liability. *Westerberg v. School District No. 792, Todd County*, 276 Minn. 1, 7, 148 N.W.2d 312, 317 (1967). The issue whether there is a legal duty to warn users of dangers is a question of law for the court. *Germann v. F.L. Machine Co.*, 395 N.W.2d 922, 924 (Minn.1986). Duty to warn consists of the duty to give adequate instructions for safe use, and to warn of dangers inherent in improper usage. *Frey v. Montgomery Ward & Co., Inc.*, 258 N.W.2d 782

(Minn.1977). Failure to warn is a cause of action separate from defective design, either on a strict liability or on a negligence theory. *Peppin v. W.H. Brady Co.*, 372 N.W.2d 369, 374 (Minn.Ct.App.1985). However, questions of adequacy of the warning, breach and causation remain jury questions. *Balder*, 399 N.W.2d at 81.

In the present case, Chemical contends it was not obligated to warn Hormel of hazards incidental to misuse of Caustic 234 of which Hormel had knowledge. Chemical argues the evidence was insufficient to allow this question to go to a jury.

*Willmar Poultry Co. v. Carus Chemical Co.*, 378 N.W.2d 830 (Minn.Ct.App.1985) provides guidance regarding the amount of evidence needed to bring the question of the user's knowledge of the hazard or danger to the jury for decision:

> Past experience with a product, however, does not necessarily alert users to all of the dangers associated with the product.

*Id.* at 835. Thus, Willmar Poultry's past experience with Potassium Permanganate did not necessarily alert it to all of the dangers associated with the product. Therefore it was appropriate for the trial court to leave the question of Willmar Poultry's knowledge of the danger to the jury. *See also Jonathan v. Kvaal*, 403 N.W.2d 256, 262 (Minn.Ct.App.1987). (Plaintiff injured while diving into shallow end of a swimming pool. This court found a manufacturer is not relieved of liability simply because dangers associated with the product are obvious to the user.)

 In the present case, Todalen admits knowing some of the risks involved with Caustic 234. He also believed, from past experience with Caustic 234, that using it in a dry state posed little serious health risk.

There is credible testimony which indicates Todalen was not aware of the exothermic reaction involved in using Caustic 234. There was evidence he had used Caustic 234 on drains before without incident. The evidence concerning Todalen's knowledge of the risks raised a question of fact for the jury.

Chemical further argues its duty to warn extends only to Hormel because Hormel chemists were aware of the dangerous propensities of Caustic 234 and Hormel had the duty to warn its employees. Chemical's theory is based upon the "learned intermediary" and "knowledgeable user" exceptions to the duty to warn. These exceptions provide where a bulk product is sold to a skilled user familiar with the risks attendant thereto and which totally controls its use, the manufacturer's duty to warn is limited, as a matter of law, to the learned or informed intermediary, and not to an employee.

Minnesota has developed this learned intermediate theory in the area of prescription drug liability. A manufacturer of prescription drugs can satisfy its duty to warn by supplying the prescribing physician with an adequate warning of hazards and risks attendant in the use of the medication. The best known case adopting this theory in Minnesota is *Mulder v. Parke Davis & Co.*, 288 Minn. 332, 181 N.W.2d 882 (1970). *See also Lhotka v. Larson*, 238 N.W.2d 870 (Minn.1976); *Borka v. Emergency Physicians Professional Association*, 379 N.W. 2d 682 (Minn.Ct.App.1986).

Minnesota courts have not addressed the issue of whether the theory of intermediate liability applies to an employer/employee relationship. It is true that some of the same considerations are present, the most important being the difficulty of warning the direct users of a chemical that is supplied in bulk to an industrial purchaser for its use. This issue has been analyzed in other jurisdictions. In *Hall v. Ashland Oil Co.*, 625 F.Supp. 1515 (D.Conn.1986) an employee died as a result of long term exposure to benzene, a chemical used by his employer for the manufacture of bulk pharmaceutical products. The widow of the employee brought suit against Ashland, manufacturer of benzene. Ashland defended on the grounds, as manufacturer, it is not required to warn employees of its industrial customers of dangers associated with its products where the customer (employer) was a knowledgeable user. *Id.* at 1516. We agree with the following statements of the *Hall* court:

It is important to recognize, however, that the medical context [of the learned intermediary theory] contains significant safeguards to the ultimate user that are not present in the industrial workplace.

\* \* \* \* \* \*

[U]nlike the doctor, whose primary purpose in selecting a drug is to promote the well-being of the ultimate user, the industrial purchaser's basic interest in selecting a chemical solvent is the overall utility of that solvent in its manufacturing processes. While avoiding health risks to its employees is a consideration that goes into choosing one chemical over another, it is not the employer's sole concern, or even its primary focus.

\* \* \* \* \* \*

A \* \* \* company may be in a position to act as an expert concerning the industrial uses and disadvantages of a chemical and yet not have the capacity to serve adequately as a learned intermediary concerning medical risks associated with the chemical.

\* \* \* \* \* \*

[T]he relationship of a doctor and patient is a one-on-one relationship where the doctor assesses the individual needs of each patient. \* \* \* [I]n the industrial work place, \* \* \* a chemical that is used may affect large numbers of people including those who do not work with it directly. Even an employer who is aware of direct effects of the chemical may be unaware of more subtle or diffuse risks. Finally, the prescription drug cases, in relieving manufacturers of the duty to warn drug users, shift that duty onto a party who can be held legally liable to the patient for failing to fulfill it. This powerful incentive is absent in the case of an employer whose liability is limited by the exclusive remedy provisions of the workmans' compensation statutes.

*Id.* at 1519–20.

There remains the question of the adequacy of the warning. The trial court was correct in submitting this question to the

jury. Chemical argues under Minnesota case law, a manufacturer of a product may, as a matter of law, be free from a duty to warn if the dangers of a product are within the professional knowledge of the user. *See Strong v. E.I. Dupont O. Nemours Co.,* 667 F.2d 682 (8th Cir.1981). *See also Minneapolis Society of Fine Arts v. Parker–Klein Associates Architects, Inc.,* 354 N.W.2d 816 (Minn.1984).

Chemical's reliance on these cases is misplaced. *Strong* and *Parker–Klein* stand for the legal proposition a manufacturer of a product may be free from a duty to warn if the final user of the product is "sophisticated." In the present case, although Hormel may have employees who may be termed "sophisticated," Todalen, the final user, is not a sophisticated user of the product. Evidence demonstrates he has a basic understanding of the principles of caustic cleaners, but nothing more. He has no special training nor knowledge of risks associated with high concentrations of sodium hydroxide when mixed with water. For these reasons it was proper for the trial court to find Chemical had a legal duty to warn and submit the question of adequacy of the warning to the jury.

### 3. *Effect of Naig Release and jury verdict on contribution claim.*

Chemical claims the trial court erred in determining Chemical's contribution claim should be based on the workers' compensation benefits paid and payable to Todalen, rather than upon the total jury verdict.

The standard of review to be applied by this court is whether the trial court erred in applying the law. *A.J. Chromy Construction Co. v. Commercial Mechanical,* 260 N.W.2d 579 (Minn.1977). This issue is purely legal in nature and this court therefore need not give deference to the decision of the trial court. *Frost–Benco Electric Association v. Minnesota Public Utilities Commission,* 358 N.W.2d 639 (Minn.1984); *Gould v. City of Bloomington,* 394 N.W.2d 149 (Minn.Ct.App.1986).

Chemical, relying on *Kempa v. E.W. Coons Co.,* 370 N.W.2d 414 (Minn.1985),

argues it should be allowed to offset its contribution claim against Hormel's subrogation interest, and its right of contribution should be calculated by multiplying the amount of fault apportioned to the employer by the total damages awarded to the employee through a jury verdict. (*See Id.* at 419.)

Appellant's reliance on *Kempa* is misplaced. *Kempa* is distinguishable because it did not involve a true *Naig* situation. In *Kempa,* after the verdict but before judgment was entered, the employee and the manufacturer entered into a settlement of the damages that were the sole responsibility of the manufacturer and which were not covered by workers' compensation benefits. The settlement was principally to avoid the manufacturer's liability for $7.9 million in punitive damages awarded by the jury. Thus the supreme court pointed out the uniqueness of its decision in *Kempa* when it stated:

> Although we have referred to the settlement between Kempa and Clark as a "Naig" settlement, it is in some respects not a typical settlement of the type considered in *Naig v. Bloomington Sanitation,* 258 N.W.2d 891, 894 (Minn.1977) because it occurred after-not before-a verdict had been returned.

\* \* \* \* \* \*

> Customarily, following a "Naig" settlement, the claim asserted by the employer is limited to the *employer's subrogation interest; the medical expenses and other workers' compensation benefits already paid by the employer and those for which the employer will be liable in the future.*

*Kempa* at 419. (Emphasis supplied by the court.) The court further concluded:

> In the employer's subrogation action the damages allowed are diminished, pursuant to Minn.Stat. § 604.01 subd. 1 (1984) by the aggregate fault of the employee and the employer.

*Kempa* at 419.

Chemical contends the manner in which the trial court determined the employer's subrogation interest penalizes it for having

entered into a *Naig* release prior to trial. This argument is not persuasive. It is not presence or absence of the *Naig* settlement that determines whether Chemical's contribution claim is based on the total workers' compensation benefits or on the total jury verdict. Rather, it is the fact that it has been found responsible for a portion of the liability. *Kempa* requires that where the employee is not in the litigation, the manufacturer's contribution claim be based on the total workers' compensation benefits paid and payable.

Chemical also argues because the jury found Todalen had not suffered a loss of future earning capacity, Hormel may not make a subrogation claim for reimbursement of a portion of future disability benefits even though Hormel is obligated to make those payments pursuant to the workers' compensation benefits.

Minn.Stat. § 176.061, subd. (3) (1980) provides in part:

Election to receive compensation from employer; subrogation. If the employee or his dependents elect to receive compensation from the employer, such employer is subrogated to the right of the employee or his dependents to recover damages against the other party. The employer may bring legal proceedings against such party and recover the aggregate amount of compensation payable by him to the employee or his dependents, together with the costs, disbursements, and reasonable attorneys' fees of the action.

This statute gives Hormel the right of subrogation. The statute attempts to balance the rights of the employee, the employer, and the third-party tortfeasor. Here, Todalen elected to receive benefits from his employer, thus Hormel acquired a right of indemnity or contribution against the third-party tortfeasor with respect to the benefits Hormel had supplied or will supply to its employee.[1]

In addition, Hormel must pay future permanent disability benefits and such benefits are part of Hormel's subrogation claim against Chemical. Chemical's argument that since the jury found Todalen had not suffered a loss of future earning capacity, that portion of Hormel's subrogation claim should be denied, is unsupported in the law. In *General Casualty Companies v. Consolidated Freightways Corp.*, 413 N.W.2d 157 (Minn.Ct.App.1987) this court held:

[T]he Workers' Compensation Act shows a legislative concern with keeping down the cost to employers of maintaining the workers' compensation scheme, balanced against the adequate provisions of benefits to employees. It does not reflect an intent to keep down the *costs* to tort-feasors at the expense of employers.

*Id.* at 160 (emphasis added). The intent of the statute is to allow subrogation to the amount of benefits paid or payable. Hormel is entitled to recover for all benefits which it will be required to pay in the future.

### 4. *Aggregation of the negligence percentages.*

█ Chemical contends the aggregated fault of Hormel (40%) and Todalen (20%) exceeds its attributed fault of 40%. Chemical maintains use of the term "aggregate" in *Kempa v. E.W. Coons*, 370 N.W.2d 414, 419 (Minn.1985), means that the employer and employee should be dealt with as a single entity, and therefore in this case the comparative fault act should bar recovery (*see* Minn.Stat. § 604.01).

The scope of review is whether the trial court erred in its application of law. *See Betlach v. Wayzata Condominium*, 281 N.W.2d 328, 330 (Minn.1979). This court need not defer to the trial court's determination on an issue of law. *Frost–Benco Electric Association v. Minnesota Public Utilities Commission*, 358 N.W.2d 639, 642 (Minn.1984).

---

1. Minn.Stat. § 176.061, subd. 10 provides:
 [N]otwithstanding the provisions of Chapter 65B or any other law to the contrary, an employer has the right of indemnity for any compensation paid or payable pursuant to this chapter, including temporary total compensation, temporary partial compensation, permanent partial disability, economic recovery compensation, impairment compensation, medical compensation, rehabilitation, death and permanent total compensation.

The trial court was correct in denying Chemical's post-trial motion to aggregate the fault of Hormel and Todalen. To grant the motion to aggregate would be contrary to the express purpose and ideals of the Workers' Compensation Act. Minn.Stat. § 176.061, subds. 3, 5(a), and 7 demonstrate that a subrogation action is not a direct action by the employer against the third party but rather the employer stands in the shoes of the employee. If the third party's fault exceeds the employee's fault as was the case here, then subrogation and contribution claims are made. Cases from appellate courts have consistently supported the basic proposition that all parties pay according to their fair share of fault. *See Lambertson v. Cincinnati Corp.*, 312 Minn. 114, 257 N.W.2d 679 (1977); *see also Kordosky v. Conway Fire & Safety, Inc.*, 304 N.W.2d 616 (Minn.1981).

Furthermore, examination of *Lambertson* shows Chemical's argument is incorrect. In *Lambertson*, the employee was found 15% at fault, the employer 60% at fault, and the third party defendant 25% at fault. Even though the "aggregate" fault of the employee and employer was greater than the third party's fault, the employer was allowed its subrogation action against the third party. *See also Kordosky, supra,* and *Hudson v. Snyder Body, Inc.*, 326 N.W.2d 149, 157 (Minn.1982) (employee's fault and employer's fault, if aggregated, were greater than third party defendant's fault. Employer, nevertheless, recovered in subrogation action).

5. *Costs and disbursements.*

Hormel appeals the trial court's ruling disallowing certain costs and disbursements. The trial court cut Hormel's requested costs and disbursement from $11,634.80 to $7,484.97. Hormel contends this was an abuse of discretion.

Minn.Stat. § 549.04 allows a prevailing party to recover certain expenditures in a district court action. That statute states, in pertinent part:

In every action in a district court, the prevailing party * * * shall be allowed reasonable *disbursements* paid or incurred, including fees and mileage paid for service of process by the sheriff or by a private person.

Minn.Stat. § 549.04 (1986) (emphasis added).

The trial court found a portion of the costs and disbursements sought by Hormel was unreasonable. The trial court was within its discretion in disallowing certain expert witness fees, out-of-state deposition fees, deposition transcript fees, and witness fees. The decision to reduce the costs and disbursements is within the trial court's discretion, and we will not reverse unless the trial court abuses its discretion. *See Jonsson v. Ames Construction, Inc.*, 409 N.W.2d 560, 563 (Minn.Ct.App.1987), *pet. for rev. denied,* (Minn. Sept. 30, 1987). Based upon the record before us we find no abuse of the trial court's discretion.

DECISION

Affirmed.