Jaime RAMON, By and Through his guardian ad litem Jose RAMON, and Jose M. Ramon and Alicia Ramon, as individuals and parents of said minor, Plaintiffs and Appellants,

v.

Boyd J. FARR, St. Benedict's Hospital, a corporation, and John/Jane Does I through X, Defendants and Appellees.

No. 20481.

Supreme Court of Utah.

Feb. 10, 1989.

Rehearing Denied Feb. 10, 1989.

**132**

Felshaw King, Clearfield, Darwin C. Hansen, Bountiful, for plaintiffs and appellants.

Richard W. Campbell, Ogden, David H. Epperson, Salt Lake City, for defendants and appellees.

ZIMMERMAN, Justice:

Plaintiffs Jose and Alicia Ramon, on behalf of their son, Jaime Ramon, appeal from a judgment rendered in a medical malpractice action upon a jury verdict in favor of defendant Dr. Boyd J. Farr. The Ramons claim that the trial court erred in refusing to give three jury instructions, including one that would have made the recommendations on a drug manufacturer's package insert prima facie evidence of the applicable standard of care. We find no error in refusing the instructions and affirm.

Dr. Farr attended Alicia Ramon for prenatal care and during the delivery of Jaime at St. Benedict's Hospital in Ogden, Utah. The Ramons' claim of negligence stems from Dr. Farr's injecting Alicia Ramon's cervical region with an anesthetic, Marcaine, approximately one hour before Jaime's birth. The procedure is known as a paracervical block.

At birth, Jaime appeared to be a normal, healthy child, but he began to show symptoms of serious problems several hours later. He was transferred to an intensive care unit and later suffered grand mal seizures. The parties agree that Jaime has serious permanent physical and mental defects and can never be expected to reach normal ranges of mental or physical development.

The Ramons brought suit against the hospital and Dr. Farr. An out-of-court settlement was reached with the hospital. During the trial of their action against Dr. Farr, the Ramons presented evidence on three theories of negligence: (i) Dr. Farr had directly injected the child's head with Marcaine, rather than injecting the mother; (ii) Marcaine should not have been used for a paracervical block because that use was not recommended by the manufacturer; and (iii) Dr. Farr had failed to inform Alicia Ramon adequately of the risks associated with using Marcaine for a paracervical block. The court rejected three jury in-

structions submitted by the Ramons that were directed to the second and third theories. The jury returned a verdict in favor of Dr. Farr. The Ramons moved for a new trial, claiming that the trial court had erred in refusing to give the three instructions. The court denied that motion and the Ramons appealed.

Before this Court, the Ramons raise no claims of error regarding their theory that the child was directly injected with the drug. This was the one claim fully submitted to the jury, and it was the claim on which the jury found for Dr. Farr. The Ramons' only contentions on appeal relate to the trial court's refusal to give their three proffered instructions. An appeal challenging the refusal to give jury instructions presents questions of law only. Therefore, we grant no particular deference to the trial court's rulings. *See, e.g., Western Kane County Special Serv. Dist. No. 1 v. Jackson Cattle Co.*, 744 P.2d 1376, 1377–78 (Utah 1987).

The Ramons' first claim arises from the trial court's refusal to submit their second theory to the jury. That theory apparently was that the mere injection of the mother and not the child with Marcaine was negligent and caused Jaime's condition. The trial court refused to give a proposed jury instruction pertinent to that theory. The instruction stated that the use of Marcaine for a paracervical block when that use was not recommended by the manufacturer is prima facie evidence of negligence.[1] Both the package insert that was shipped with the Marcaine and the 1980 (34th ed.) *Physician's Desk Reference* ("P.D.R.") at page 695 read: "Until further clinical experience is gained, paracervical block with Marcaine is not recommended."[2] The Ramons claim that the trial court erred in rejecting the proposed instruction.

The proposed instruction pertained only to the Ramons' second theory, which the trial court did not submit to the jury. The court was justified in withholding that theory from the jury's consideration because the Ramons failed to present legally sufficient evidence of causation. *See, e.g., Chadwick v. Nielsen*, 763 P.2d 817, 821–22 (Utah Ct.App.1988). The record contains no evidence that could support a factual finding by the jury that injecting the mother with Marcaine could adversely affect a child who had not also been injected. Because the trial court justifiably refused to submit the Ramons' second theory to the jury, its rejection of the proposed instruction on that theory was proper.

But even if there were sufficient evidence of causation to submit the Ramons'

---

1. Instruction No. 19, rejected by the court, provides:

   You are instructed that the manufacturers of Marcaine included a package insert which stated that "Until further clinical experience is gained, paracervical block with Marcaine is not recommended. Fetal bradycardia frequently follows paracervical block with some amide-type local anesthetics and may be associated with fetal acidosis," and that the *Physician's Desk Reference* contained an identical warning. The Defendants either knew or should have known of such warning. If you find that the Defendants nevertheless proceeded to use Marcaine as a paracervical block and that such use was a proximate cause of Plaintiffs' injuries, then, the fact that Defendants used Marcaine for a paracervical block contrary to such written warning would be prima facie evidence of negligence by the Defendants. Prima facie means that such action by Defendants would not be conclusive, but that in the absence of other evidence which is convincing in repudiating the assumption, that such actions were reasonable

and prudent, you should find in favor of the Plaintiffs and against one or both of the Defendants.

2. The Food and Drug Administration ("FDA") requires that package inserts accompany shipments of prescription drugs. Furthermore, the FDA must approve the scope and accuracy of the information the manufacturers put in the inserts before releasing a new drug. Although physicians usually do not see these inserts, for most drugs the same information is also printed at the manufacturer's expense in the P.D.R., which is published annually and supplemented quarterly. Each licensed physician receives a complimentary copy. A typical entry includes the trade and chemical names of the drug, a description of the drug, indications and contraindications for its use, warnings, adverse reactions, administrations and dosage, and information on managing and adjusting the dosage of the drug. In this case, the language at issue was identical in both the package insert that was shipped with the Marcaine and in the P.D.R. for 1980, the year Jaime was born.

second theory to the jury, we have another reason for upholding the trial court's refusal to give the proposed instruction: we decline to adopt the legal rule that it states. The Ramons observe that the Utah courts have not settled the question of the legal effect to be given recommendations that are issued by drug manufacturers in the form of package inserts and P.D.R. entries. They argue that we should follow the rule that the insert constitutes prima facie evidence of the applicable standard of care. In other words, they ask us to hold that the mere introduction in evidence of an insert or P.D.R. entry shifts the burden of proof on the standard of care to the defendant physician.

In response, Dr. Farr first observes that the insert language at issue did not contraindicate[3] the use of Marcaine for paracervical blocks, but simply stated that the manufacturer was not recommending the use of the drug without further testing. He urges us to hold that the package insert is only some evidence that the jury can take into account in determining the standard of care and that the plaintiff in a medical malpractice action usually bears the burden of introducing evidence on the standard of care in the form of expert testimony. *See, e.g., Chadwick v. Nielsen,* 763 P.2d at 821–22 (citing, *inter alia, Nixdorf v. Hicken,* 612 P.2d 348, 351–52 (Utah 1980); *Robinson v. Intermountain Health Care, Inc.,* 740 P.2d 262, 264 (Utah Ct.App. 1987); *Getchell v. Mansfield,* 260 Or. 174, 179–80, 489 P.2d 953, 955 (1971). In support of this position, Dr. Farr argues that the decision to use a particular drug is always a matter of judgment for the physician based on all information available, including medical journals, advice from colleagues, professional experience, and the

information provided by manufacturers. He contends that it would be unrealistic to straitjacket a physician's treatment choices with package inserts.

We recognize that the courts appear to be split on whether the recommendations contained in a package insert are prima facie evidence of the standard of care. One line of authority relied on by the Ramons is represented by *Mulder v. Parke Davis & Co.,* 288 Minn. 332, 181 N.W.2d 882 (1970). In *Mulder,* the Minnesota Supreme Court held that when a drug manufacturer provides recommendations concerning the administration and proper dosage of a prescription drug and also warns of the dangers inherent in its use, a physician's "deviation from such recommendations is prima facie evidence of negligence if there is competent medical testimony that his patient's injury or death resulted from the doctor's failure to adhere to the recommendations." 288 Minn. at 339–40, 181 N.W.2d at 887 (per curiam opinion on petition for rehearing). *Mulder* has been followed by the courts of only a few other states. *See Ohligschlager v. Proctor Community Hosp.,* 55 Ill.2d 411, 417–18, 303 N.E.2d 392, 396 (1973); *Mueller v. Mueller,* 88 S.D. 446, 453, 221 N.W.2d 39, 43 (1974); *Paul v. Boschenstein,* 105 A.D. 2d 248, 249–50, 482 N.Y.S.2d 870, 871–72 (1984) (per curiam). And the Minnesota courts have since retreated somewhat from the *Mulder* standard. *See Lhotka v. Larson,* 307 Minn. 121, 131–32, 238 N.W.2d 870, 877 (1976) (Chanak, J., dissenting). Minnesota presently requires a *Mulder* prima facie negligence instruction only when the manufacturer's instructions contain a clear and explicit warning against the type of use that is alleged and a deviation from that recommendation caused the injury.[4]

---

**3.** In the lexicon of package inserts, a contraindication is a clear recommendation against the use of a drug or method of treatment "because the risk of use clearly outweighs any possible benefit." Comment, *Package Inserts for Prescription Drugs as Evidence in Medical Malpractice Suits,* 44 U.Chi.L.Rev. 398, 414 n. 75 (1977) (citations omitted); *accord id.* at 437.

**4.** Since *Mulder,* the Minnesota Supreme Court has added the requirement that the manufacturer's recommendation establish a clear and ex-

plicit standard. *Lhotka v. Larson,* 307 Minn. 121, 124–27, 238 N.W.2d 870, 873–75 (1976). The Minnesota Court of Appeals has also held that a *Mulder* instruction may be given only if there is evidence sufficient to establish that the physician deviated from the drug company's recommendations and that the deviation caused the injury. *Borka v. Emergency Physicians Professional Ass'n,* 379 N.W.2d 682, 684–85 (Minn. Ct.App.1986). More recently, that court stated that a *Mulder* instruction is warranted only if

In the present case, the manufacturer did not make such a clear and explicit recommendation against the use of Marcaine for a paracervical block. Rather, it simply did not recommend its use until further studies were performed. Thus, even under the current Minnesota rule, the Ramons would not be entitled to their proposed jury instruction.

■ In any event, we decline to follow the *Mulder* rule, either as originally articulated or in its current incarnation. Rather, we think the better rule is that manufacturers' inserts and parallel P.D.R. entries do not by themselves set the standard of care, even as a prima facie matter. A manufacturer's recommendations are, however, some evidence that the finder of fact may consider along with expert testimony on the standard of care.

This approach found expression in the 1957 California Court of Appeals decision in *Salgo v. Leland Stanford Jr. Univ. Bd. of Trustees*, 154 Cal.App.2d 560, 577, 317 P.2d 170, 180 (1957) (emphasis added):

Thus, while admissible, [the package insert] cannot establish as a matter of law the standard of care required of a physician in the use of the drug. It may be considered by the jury along with the other evidence in the case to determine whether the particular physician met the standard of care required of him....

The mere fact of a departure from the manufacturer's recommendation where such departure is customarily followed by physicians ... in the locality does not make that departure an "experiment." *There was in this case no evidence of experiment and the instructions concerning "experiment" should not have been given.*

Although the *Salgo* court did not expressly address the issue of proof of the standard

of care apart from proof of deviation from the standard, it did require the plaintiff to prove both of those elements by means of evidence above and beyond the package insert.

Other jurisdictions have adopted the *Salgo* approach and have held that inserts and analogous materials are only some evidence to be considered in fixing the standard of care. *See Rodriguez v. Jackson*, 118 Ariz. 13, 17–18, 574 P.2d 481, 485–86 (Ct.App.1977) (a manual that is analogous to a package insert is not sufficient evidence of the standard of care to withstand a motion for summary judgment); *Crouch v. Most*, 78 N.M. 406, 408, 432 P.2d 250, 252 (1967) (snake bite antivenin kit instructions prepared by the kit's manufacturer for lay users as well as physicians are not sufficient evidence of the standard of care to shift the burden of proof on that issue to the defendant physician); *Piano v. Davison*, 157 Ill.App.3d 649, 674–75, 110 Ill.Dec. 35, 52–53, 510 N.E.2d 1066, 1083–84 (1987) (the plaintiff has the burden of proving that a brain shunt manufacturer's use instructions establish the standard of care), *appeal denied*, 119 Ill.2d 574, 119 Ill.Dec. 397, 522 N.E.2d 1256 (1988); *Haynes v. Baton Rouge Gen. Hosp.*, 298 So.2d 149, 153–55, 157 (La.Ct.App.) (the trial court properly refused jury instructions to the effect that a drug package insert establishes the standard of care), *writ denied*, 302 So.2d 33 (La.1974).

We think that better reasoning supports the *Salgo* rule. Although package inserts may provide useful information, they are not designed to establish a standard of medical practice, and their conflicting purposes make it extremely unlikely that they could be so designed.

The American Medical Association, while recognizing inserts as one useful source

injury is proven. *Kollmorgen v. State Board of Medical Examiners*, 416 N.W.2d 485, 488 (Minn. Ct.App.1987) (review denied Feb. 17, 1988).

The Illinois courts also appear to have retreated from their original adoption of the *Mulder* rule. In *Young v. Cerniak*, 126 Ill.App.3d 952, 972, 81 Ill.Dec. 923, 925, 467 N.E.2d 1045, 1057 (1984), the Illinois Appellate Court found that the manufacturer's formula for determining the proper dosage was not clear and explicit enough

to establish the standard of care. More recently, the same court refused to apply the *Mulder* rule to the insert accompanying a brain shunt apparatus, holding that it was the plaintiff's burden to prove that such an insert established the standard of care. *Piano v. Davison*, 157 Ill.App.3d 649, 674–75, 110 Ill.Dec. 35, 52–53, 510 N.E.2d 1066, 1083–84 (1987), *appeal denied*, 119 Ill.2d 574, 119 Ill.Dec. 397, 522 N.E.2d 1256 (1988).

of information, has repeatedly alleged that inserts are an inadequate standard for medical practice, pointing to the inconsistent purposes served by the document[s]—advertising for the manufacturer, regulation by the government, and information for the doctor—and to the poor quality of past inserts.

Comment, *Package Inserts for Prescription Drugs as Evidence in Medical Malpractice Suits*, 44 U.Chi.L.Rev. 398, 416 (1977) (footnotes omitted). Dr. Peter H. Rheinstein, former director of the Food and Drug Administration's ("FDA") Drug Advertising Division, has noted that the FDA's requirements for package inserts conflict with any attempt to use the inserts to establish practice standards.

> [D]ifferences between the package insert and accepted medical practice represent the difference between the rigorous proof a regulatory agency must demand and the clinical judgment of a physician based on his training, experience, and skill as related to the needs of his individual patient. One cannot be taken as a standard for the other.

Rheinstein, *Drug Labeling as a Standard for Medical Care*, 4 J.Legal Med. 22, 24 (Jan. 1976). We therefore conclude that the trial court acted properly in refusing to give the Ramons' requested jury instruction on the effect of the insert.

The Ramons' second claim is that the trial court erred in refusing to give two jury instructions embodying their third theory, to wit: that they were entitled to recover because Dr. Farr failed to give Alicia Ramon information in his possession regarding the paracervical block procedure that she needed before she could give an informed consent to the medical procedures and medications used in the delivery of Jaime. One of the proffered instructions set out the language of the Marcaine package insert and stated that Dr. Farr did not inform Alicia Ramon of this warning.[5] The other proffered instruction set out the elements of a claim under Utah's Informed Consent Statute, section 78–14–5 of the Code, and stated that Dr. Farr had a duty to inform Alicia Ramon that he was going to use Marcaine for a paracervical block and of the risks associated with that use.[6]

---

5. Instruction No. 28, rejected by the court, provides:

> In connection with the use of the drug Marcaine by the Defendants and your determination as to whether or not the Defendants were negligent by its use and/or whether or not the Defendant had a duty to inform Plaintiff Alicia Ramon of its use, you may take into consideration the fact that the manufacturer of Marcaine inserted a package insert with the drug used on Mrs. Ramon warning that "Until further clinical experience is gained, paracervical block with Marcaine is not recommended. Fetal bradycardia frequently follows paracervical block with some amide-type local anesthetics and may be associated with fetal acidosis"; that the *Physicians' Desk Reference* for 1980 contained exactly the same warning and that both Defendants were aware of such warnings at the time Marcaine was used upon Mrs. Ramon, but that neither Defendant informed Mrs. Ramon of such warning or told her that Marcaine would be used for a paracervical block.

6. Instruction No. 34, also rejected by the court, provides in part:

> It is the settled general rule that in the absence of an emergency or unanticipated condition, a physician must first obtain the consent of the patient before treating or operating upon him or her.
>
> The relationship between a physician and his patient creates a duty in the physician to disclose to his patient any material information concerning the patient's physical condition and treatment. This duty to inform stems from the fiduciary nature of the relationship and the patient's right to determine what shall or shall not be done with his or her body. The scope of the duty is defined by the materiality of the information in the decisional process of an ordinary individual. If a reasonable person in the position of the patient would consider the information important in choosing a course of treatment, then the information is material and disclosure is required. Once the duty to disclose certain information is established, then the physician's total breach of that duty presents to the jury the question of what damages were proximately caused by the breach of the duty.
>
> Under Utah law, it shall be presumed that what the physician did to or for a patient was either expressly or impliedly authorized to be done. However, this is a rebuttable presumption and a patient may recover damages from a physician based upon the physician's failure to obtain the informed consent of the patient, upon showing [the elements of section 78–14–5(1)].

■ We need not reach the merits of the Ramons' claims regarding these instructions because we conclude that any error in refusing to give them was harmless. *See* Utah R.Civ.P. 51, 61.

Section 78–14–5 of the Code does recognize that a plaintiff can recover from a physician for failure to obtain informed consent. *See* Utah Code Ann. § 78–14–5 (1987). But even if Dr. Farr had failed to get consent either to use Marcaine as an anesthetic or even to administer a paracervical block, the Ramons' claim could only be upheld if all the elements of this statute were satisfied. The element at issue in this case is that of causation. Section 78–14–5(1)(g), which contains the causation requirement, provides in part:

(1) When a person submits to health care rendered by a health care provider, it shall be presumed that what the health care provider did was either expressly or impliedly authorized to be done. For a patient to recover damages from a health care provider in an action based upon the provider's failure to obtain informed consent, the patient must prove the following:

. . . .

(g) *The unauthorized part of the health care rendered was the proximate cause of personal injuries suffered by the patient.*

Utah Code Ann. § 78–14–5(1)(g) (1987) (emphasis added).

It is undisputed by the parties that injecting a baby with any anesthesia would seriously damage the child and would be outside the standard of care. Thus, when the jury returned the verdict of no cause on the first theory, it had to find as a matter of logic that the baby was not injected. The jury was not allowed to consider the Ramons' second theory because they failed to introduce any legally sufficient evidence

that even if the baby was not injected, injecting the mother with Marcaine could cause the harm. The Ramons did not establish the necessary causal link between the injection and the harm to the child on either theory. Therefore, the statutory causation requirement of section 78–14–5(1)(g) could not have been met in this case.

Since the outcome would have been the same even if the instructions had been given, the trial court's rejection of the Ramons' instructions could not have been harmful error.

The judgment is affirmed.

HALL, C.J., and STEWART and DURHAM, JJ., concur.

HOWE, Associate C.J., concurs in the result.

---

In this case, Plaintiffs claim that Defendant Farr had a duty to inform Plaintiff Alicia Ramon that he was going to use Marcaine as a paracervical block in connection with the delivery of Jaime Ramon and that he failed so to inform her and failed to inform her of the risks associated with the paracervical block procedure and the use of Marcaine in connec-

tion therewith. Plaintiffs further allege that as a proximate result of the use of Marcaine with a paracervical block that injuries to Jaime Ramon resulted. If you find that Defendant Farr breached his duty and responsibility to inform and obtain the consent of Alicia Ramon and that injuries to Plaintiffs proximately resulted from such failure, then you should find in favor of Plaintiffs.